ANDREW F. McBRIDE, JR., AND EUGENIA L. McBRIDE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6044–66.   Filed April 3, 1968.

*Edward F. Merrey, Jr.,* for the petitioners.
*William M. Gross,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1963 in the amount of $1,327.57. Petitioners concede that they understated their professional income for that year in the amount of $5,565 but contend that they sustained a deductible demolition loss in the amount of $13,288.75 and had certain ordinary and necessary expenses in connection with rental property which were not allowed as deductions. On this basis they allege they overpaid their taxes for 1963.

The questions presented are whether petitioners are entitled to deduct a loss arising from the demolition of a building owned by them, and are entitled to deduct certain expenses incurred in connection with the building prior to its demolition. The issues to be resolved hinge on two questions: (1) Whether petitioners converted a building formerly used by them as a residence and office into property held exclusively for business or income-producing use; and (2) if such conversion took place, whether petitioners intended at the time of conversion to demolish the building located on the property.

1

FINDINGS OF FACT

Some of the facts have been stipulated and are accordingly so found.

Petitioners [1] are husband and wife and resided in Franklin Lakes, N.J., at the time the petition in this case was filed. Petitioner filed a Federal income tax return for the taxable year 1963 with the district director of internal revenue, Newark, N.J. It is stipulated that an amended return for that year and a claim for refund were filed on March 8, 1965, and that a second amended return and an amended claim for refund were filed on February 4, 1965. [2] The amended claim for refund alleged an overpayment of income tax for 1963 in the amount of $5,082.90 on the ground that petitioner was entitled to deduct a loss resulting from the demolition in February 1963, of a structure (sometimes hereinafter called the Broadway building) on his premises at 655 Broadway, Paterson, N.J. In the computation of the amount claimed as a refund petitioner took into taxable income $5,565 of professional income which was inadvertently understated in his original and first amended 1963 returns.

Petitioner, a physician, inherited the Broadway building on May 24, 1956. Prior to July of 1961, he used 75 percent of the Broadway building as a residence for himself and his family and 25 percent of the building as an office and related facilities for his medical practice. The Broadway building was a one-family, turn-of-the-century house with four rooms on the first floor, four on the second floor, and three on the third floor. A central open staircase extended through all three floors and the only kitchen was located on the first floor.

In 1958 petitioner purchased a residential lot for the purpose of building a new home for himself and his family; however, petitioner did not move from the Broadway building until July 1961.

In 1958, Henry Lucht, an architect, at petitioner's request prepared preliminary plans for remodeling the Broadway building to provide medical offices on the first floor and an apartment on the second and third floors. Also in late 1958, petitioner consulted Samuel P. Vought, a local real estate broker, concerning possible rental in-

---

[1] Eugenia L. McBride is a party to this proceeding by reason of the fact that a joint return was filed. Andrew F. McBride, Jr., will hereinafter be referred to as petitioner.

[2] There is some confusion as to the sequence of filing the amended return and claim for refund and the second amended return and amended claim for refund. The amended return was dated Sept. 25, 1964, and the claim for refund attached thereto was dated Mar. 3, 1965; both were stamped received by the Internal Revenue Service on Mar. 8, 1965. The second amended return was dated Jan. 28, 1965, and the amended claim for refund was dated Feb. 2, 1965; both were stamped received by the Internal Revenue Service on Feb. 4, 1965. The amended claim for refund states that it supersedes the claim and amended 1963 return filed on or about Sept. 30, 1965. In any event both amended returns and claims for refund were filed within 3 years from the date the original return was filed. Sec. 6511(b)(2)(A), I.R.C. 1954, as amended.

come from the portion of the premises he was then using as a residence and plans for remodeling the second and third floors of the building.

Peter J. McDonnell (hereinafter referred to as McDonnell) entered practice as a surgeon prior to 1956. He often assisted petitioner with his cases and later performed for petitioner administrative work such as maintaining charts and other records. Beginning in 1956, petitioner compensated McDonnell for these services at the rate of $200 per month. Prior to October 1961, McDonnell from time to time suggested to petitioner that the monthly payments be terminated. The payments were not terminated by petitioner, however, and continued through September 1961.

As early as 1958, petitioner and McDonnell discussed merging their respective medical practices into a partnership which would utilize either petitioner's offices or a building then occupied by McDonnell and used as part residence, part office. By October 1961, the discussions between the two doctors had ripened into definite plans to form a partnership, although McDonnell's subsequent decision to shift his specialty of practice to industrial medicine terminated the plans before the two practices were merged.

As a direct result of the pending merger of his medical practice with that of petitioner, McDonnell sold his combination home and office. The closing transaction was effected in October 1961, and at that time McDonnell and his family moved into the residential portion of the Broadway building and continued to occupy it until about June 15, 1962. At the time McDonnell moved into the residential portion of the building he was aware that petitioner was considering a plan to remodel the building, and he had an understanding with petitioner that the premises would be surrendered if and when petitioner requested him to vacate. McDonnell also used the office facilities of the Broadway building two evenings each week in connection with his medical practice. The reasonable rental value of the portion of the building occupied by McDonnell as a residence was approximately $200 per month. McDonnell made no cash rental payments to petitioner for use of the Broadway building. When McDonnell moved his family into the building petitioner ceased making the payments of $200 per month to McDonnell for services rendered to him, although McDonnell continued to perform the same services for petitioner until at least February 1963.

In the latter part of 1961, petitioner requested Henry Johnson, an architect who had prepared the plans for petitioner's new residence, to submit proposals with respect to remodeling the building to provide two suites of medical offices on the first floor, to be occupied by petitioner and McDonnell, and residential units on the second and

third floors. Two sets of plans were submitted by Johnson in February 1962, for petitioner's approval.

On October 6, 1961, petitioner wrote Marshall Erdman & Associates, Inc., building contractors, requesting literature concerning the construction of a medical suite of offices. His letter states, "I am interested in receiving any literature you might have concerning the construction of a Doctor's medical suite. I am contemplating making some changes and any help that you may have to offer will be appreciated." The primary business of Marshall Erdman & Associates, Inc., was the design and construction of new medical office buildings, although it frequently designed interiors for existing medical offices.

On June 15, 1962, McDonnell and his family moved from the Broadway building to a house at Point Pleasant Beach, N.J. This house had been owned by McDonnell for some time prior to June 1962, and had been used by him as a summer home. The house is located approximately 60 miles from McDonnell's office.

At the time McDonnell and his family vacated the residential quarters in the Broadway building, McDonnell's wife offered petitioner a check for $1,000 as rent for the apartment. The check was placed in petitioner's desk or with his secretary with a note of thanks. Petitioner refused to accept the payment and destroyed the check.

On August 30, 1962, petitioner made an initial application for a building permit to erect a new medical office structure on the site of the Broadway building. Under date of September 5, 1962, petitioner was advised by the building inspector of the City of Paterson that a permit for a new medical building could not be issued for his premises since the area and dimensions of the plot did not meet the minimum requirements for the projected use.

On November 14, 1962, petitioner filed an application with the Paterson Board of Adjustment for a variance to erect a proposed doctors' medical office building on the site. After a hearing, the board granted the variance on November 29, 1962. Petitioner executed a contract, dated December 28, 1962, with Marshall Erdman & Associates, Inc., for construction of the new medical office building. The Broadway building and detached garage were demolished in February 1963, and a new medical office building was then erected on the lot.

In his income tax return for the taxable year 1962, petitioner reported rental income in the amount of $2,400 as being derived from the building, and deducted the same amount as fees paid to McDonnell. No funds were transferred between the parties subsequent to October 1, 1961. Petitioner did not report any rental income from the building on his income tax return for 1961.

In the notice of deficiency for 1963, petitioner was allowed a deduction of $3,247.08 as a demolition loss on that portion of the Broadway building devoted to business use. It is stipulated that if this Court determines that petitioner incurred a deductible loss with respect to the residential portion of the Broadway building, the amount of the loss was $13,288.75, all of which would be deductible in the taxable year 1963.

Between January 1, 1963, and February 1963, when the Broadway building was demolished, petitioner incurred ordinary and necessary expenses for the residential portion of the building in the amount of $255.12 for water, gas, electricity, fuel, and insurance and had depreciation in the amount of $53.75.

### ULTIMATE FINDINGS OF FACT

The arrangement between McDonnell and petitioner, beginning in October 1961, was a rental of the residential portion of the Broadway building with the $200-per-month cash payments for services being discontinued in lieu of rent. This arrangement constituted a conversion of the portion of the Broadway building previously held for personal use into property held for business or income-producing use. At the time the property was so converted, petitioner did not intend to demolish the Broadway building.

### OPINION

In a timely claim for refund filed on February 4, 1965, along with an amended return for the calendar year 1963, petitioner sought a deduction for a loss in the total amount of $16,535.83 for the demolition of the Broadway building. Without formally acting on the claim for refund, respondent issued a notice of deficiency on August 8, 1966, in which the demolition loss attributable to the portion of the Broadway building used as medical offices ($3,247.08) was allowed, petitioner's income was increased by the amount of the professional income omitted from the original return, the demolition loss attributable to the portion of the Broadway building once used by petitioner as his residence ($13,288.75) was disallowed, and certain expenses incurred in 1963 with respect to the "residential" portion of the building were disallowed. Petitioner alleges that respondent erred in making the last two adjustments.

Demolition losses are deductible if they meet the requirements of section 165 (a),[3] which allows as a deduction "any loss sustained during the taxable year and not compensated for by insurance or other-

---

[3] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

wise," as limited in the case of individuals by section 165(c).[4] Section 1.165-3(b)(1), Income Tax Regs., prescribes the specific conditions for applying the limitations of section 165(c) in the case of demolition losses where the intent to demolish is formed subsequent to the time of acquisition:

> (b) *Intent to demolish formed subsequent to the time of acquisition.* (1) Except as provided in subparagraph (2) of this paragraph, [exception not applicable] the loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. The amount of the loss shall be the adjusted basis of the buildings demolished increased by the net cost of demolition or decreased by the net proceeds from demolition. * * * The basis of any building acquired in replacement of the old buildings shall not include any part of the basis of the property demolished.

Respondent contends that petitioner's loss from the demolition of the portion of the Broadway building once used by petitioner as a residence was not incurred in a trade or business or in a transaction entered into for profit, and therefore is a nondeductible personal loss. Respondent argues that the arrangement between petitioner and McDonnell did not convert the portion of the building once used as petitioner's residence into rental property. In the alternative respondent argues that even if there was a rental arrangement, (1) the rental arrangement was not a transaction entered into for profit, (2) rent was actually paid by McDonnell for the use of the office portion of the building, or (3) the property was reconverted to residential property prior to demolition. For the same reasons, respondent contends, utility expenses and depreciation attributable to the "residential" portion of the building for the period between January 1, 1963, and the date of demolition in February 1963 are not deductible.

Petitioner contends that the arrangement with McDonnell constituted a conversion of the residential portion of the Broadway building into property used in petitioner's trade or business or for the production of income and that at the time of this conversion he did not intend to demolish the building. Upon these facts petitioner asserts that he is entitled to a full deduction for the demolition loss in 1963. We agree with petitioner.

Under section 1.165-3(b)(1), Income Tax Regs., quoted above, a loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings is allowable as

---

[4] SEC. 165. LOSSES.

(c) Limitation on Losses of Individuals.—In the case of an individual, the deduction under subsection (a) shall be limited to—

   (1) losses incurred in a trade or business;

   (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *

a deduction only "if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished." Petitioner acquired the Broadway building by inheritance in 1956 and it is clear that his demolition plans were formed after that date. However, we do not think inheritance is the kind of "acquisition" referred to in the regulation. The acquisition of property by inheritance is a neutral fact, *Estelle G. Marx*, 5 T.C. 173 (1945) ; *N. Stuart Campbell*, 5 T.C. 272 (1945) ; and where, as in this case, a building is inherited and then devoted to personal use before it is converted to business or income-producing use, the crucial question is whether petitioner intended to demolish the building when it was so converted. Such a conversion of property to the production of income is the kind of transaction that the term "acquisition" as used in the regulation was intended to describe. Cf. *Heiner* v. *Tindle*, 276 U.S. 582 (1928).

Petitioner occupied three-fourths of the Broadway building as a residence prior to July 1961. Since the regulation limits the demolition loss deduction to a loss incurred in a trade or business or a transaction entered into for profit, petitioner must show that the residential portion of the building was converted to business or income-producing use prior to its demolition in order to qualify for the deduction. He must show that he terminated the personal residence use and entered into a profit-inspired transaction with respect to the use of the property. Cf. *Warren Leslie, Sr.*, 6 T.C. 488 (1946).

The rule has long been established that an actual rental of a building constitutes a conversion thereof from personal use to business or income-producing use, i.e., a transaction entered into for profit under section 165. *Heiner* v. *Tindle, supra;* cf. sec. 1.165–9(b) (1), Income Tax Regs. We are convinced that petitioner's arrangement with McDonnell was intended to be, and was, such a conversion.

When petitioner completed and moved into his new home in July 1961, he effectively terminated use of the Broadway building as a residence for himself and his family. Thereafter, the evidence is clear, he had no intention to, and indeed did not, resume using the building as his residence. Shortly after petitioner moved his residence from the building, he rented it to McDonnell who had sold his own combination office and residence in October 1961. McDonnell moved his residence to the Broadway building as a step toward establishing a partnership with petitioner. Beginning in 1956 petitioner paid McDonnell $200 per month for assisting him in his medical practice, handling some cases and maintaining charts and other records. These payments continued through September 1961 and then ceased. In October 1961, McDonnell moved his family into the residential portion of the Broadway building and occupied it as a residence until June 15, 1962. McDonnell continued to perform essentially the same services for peti-

tioner that he had previously performed but received no other compensation than use of the Broadway building. The evidence shows that the fair rental value of the residential portion of the building was approximately $200 per month. We think it is quite clear from the record that beginning in October 1961, McDonnell performed services for petitioner in lieu of the payment of cash rent. The fact that the rent was in the form of services rather than cash does not, of course, prevent the arrangement from constituting a rental of the building. Cf. *Dean* v. *Commissioner*, 187 F. 2d 1019 (C.A. 3, 1951), affirming a Memorandum Opinion of this Court.

Other circumstances support our finding that petitioner converted the residential portion of the Broadway building to business or income-producing property in October 1961, when he rented it to McDonnell. In 1958, when petitioner acquired a lot on which to build a new home, he retained Henry Lucht, an architect, to prepare preliminary plans for remodeling the Broadway building to provide medical offices on the first floor and an apartment on the second floor. Also in 1958, petitioner consulted Samuel P. Vought, a real estate broker, with respect to changes needed to make the second and third floors suitable for rental purposes. At this point he apparently intended to complete his new residence promptly, move into it, and use the residential portion of the Broadway building for rental purposes. His home construction did not progress as rapidly as he originally anticipated, but it is clear that he continued to consider plans for renovation of the Broadway building to make it more suitable for rental purposes. Before McDonnell moved his family into the building he was shown a set of plans for renovating the building. Indeed, even after McDonnell and his family moved into the building petitioner consulted Henry Johnson, an architect, who, in February 1962, submitted proposals for remodeling the building to provide two suites of medical offices on the first floor and residential units on the second and third floors thus indicating an intention on the part of petitioner to continue renting the building.

We are aware that mere plans to rent, or the listing of property with a broker for sale or rent, or even for rent alone, is not appropriating or using such property for income-producing purposes. Cf. *Morgan* v. *Commissioner*, 76 F. 2d 390 (C.A. 5, 1935), certiorari denied 296 U.S. 601; *Rumsey* v. *Commissioner*, 82 F. 2d 158 (C.A. 2, 1936), certiorari denied 299 U.S. 552; *Allen L. Grammer*, 12 T.C. 34 (1949). But we think this history of repeated studies of renovation plans shows that the rental of the property to McDonnell in October 1961 was the culmination of a previously laid, long-term plan and thus confirms our finding that the property was actually converted to business or income-producing use at that time.

Further, this history of petitioner's remodeling plans corroborates petitioner's testimony that he had not formulated any plan to demolish the Broadway building in October 1961 when he rented it to McDonnell. True, petitioner frankly admitted that from some time in the late 1950's he considered various alternatives, including selling the entire property and moving his practice to a new location, remodeling the old building, and demolishing the old building and constructing a new one. But his careful study of alternatives does not show that he had reached a decision to demolish the old building prior to the rental to McDonnell. True, also, he consulted with Marshall Erdman & Associates, Inc., a firm specializing in the planning of new medical buildings, on October 6, 1961, before McDonnell moved his family to the Broadway building. But the evidence on the Erdman consultation, viewed as a whole, is as consistent with a plan to remodel the old building as to construct a new one. The employment of architect Henry Johnson in the latter part of 1961, after McDonnell had already moved his family into the building, to draft remodeling plans which were not delivered until February 1962, is wholly inconsistent with any notion that petitioner had decided to demolish the building before it was rented to McDonnell. The demolition plan had not, in any event, been adopted when McDonnell moved into the building in October 1961.

We are convinced that petitioner reached a decision to demolish the Broadway building on some date between February and June 1962. During this period he had before him the Johnson renovation plans which evidently raised doubts in his mind as to the feasibility of remodeling the building. During this period the building was occupied by the McDonnell family and he had an opportunity for the first time to evaluate the feasibility of the combination office and residence arrangement when a family other than his own occupied the building as a residence. Furthermore, although the record does not show precisely when the plans for a partnership with McDonnell were discarded we are convinced that doubts arose during this period as to the feasibility of the proposed arrangement between the two doctors.[5] All these factors lead us to conclude that on some date during this period petitioner reached his decision to demolish the building.

Respondent argues that, even if the arrangement between petitioner and McDonnell was a rental, the arrangement was not a transaction entered into for profit but merely an accommodation to McDonnell. This contention is not supported by the evidence. We have found that

---

[5] We infer that relations between the two families became strained during this period from the evidence on the manner in which the check for $1,000 was unceremoniously left in petitioner's desk by the McDonnells when they moved from the building. Petitioner's destruction of the check is not inconsistent with our conclusion, discussed below, that the McDonnells were not permitted to use the building as a mere accommodation.

the occupancy of the residential portion of the building by McDonnell was in lieu of the $200 per month which had previously been paid for various services. The fair rental value of the residential portion of the premises was approximately $200 per month. It is evident that McDonnell's services were of substantial value to petitioner since he had made monthly payments to McDonnell of $200 since 1956. McDonnell continued to perform essentially the same services for petitioner after October 1961, that he had performed prior to that time. We believe the evidence requires a finding that the rental arrangement was a transaction entered into for profit.

Respondent's contention that the rent, if any, was paid for use of the office portion of the building, and very little, if any, was paid for the residential portion, is unsupported. The testimony of McDonnell shows that the business part of the building was used by him only 2 nights a week. It is clear, so far as McDonnell was concerned, that the use of the residential portion of the property was of primary importance to him. As he testified, it would have been relatively easy to find an office to use for 2 nights a week as opposed to finding a place for his wife and family to live.

Respondent, relying on section 1.165–9 (b) (1), Income Tax Regs., which is in pertinent part as follows, argues that even if the residential portion of the property was converted to an income-producing use, the property was later reconverted to personal use prior to demolition:

(b) *Property converted from personal use.* (1) If property purchased or constructed by the taxpayer for use as his personal residence is, prior to its sale, rented or otherwise appropriated to income-producing purposes *and is used for such purposes up to the time of its sale,* a loss sustained on the sale of the property shall be allowed as a deduction under section 165(a). [Emphasis added.]

Respondent apparently contends that property once converted to income-producing purposes by a rental, will automatically be reconverted to nonbusiness use when the rental arrangement ceases and the property becomes available for personal use. We have found no authority supporting this position. We think that a proper interpretation of this regulation is that if residential property is converted to income-producing purposes prior to sale, and is not reconverted by some conduct of the owner prior to sale, the owner is entitled to a deduction for a loss sustained on the sale. Cf. *Gevirtz* v. *Commissioner,* 123 F. 2d 707 (C.A. 2, 1941); *Gilbert Wilkes,* 17 T.C. 865 (1951). By an analogy the same rule should apply in the case of the demolition of a building as contemplated by section 1.165–3 (b) (1), Income Tax Regs., *supra.*

The evidence in this case does not show a reconversion of this property to personal use. In June 1962, when McDonnell vacated the Broadway building petitioner was living in the new residence which he had

constructed prior to moving out of the old building. There is no evidence indicating that he intended to reoccupy the Broadway building as his residence. To the contrary, the vacancy of the residential portion of the building from June 15, 1962, to February 1963, is explained by the fact that petitioner was proceeding with plans to demolish the building which were uncertain because of the need to get a variance of certain building code regulations. He applied for a building permit on August 30, 1962, which was denied on September 5, 1962. The variance was obtained on November 29, 1962, and the building was demolished in February 1963. Obviously, the property was not reconverted to personal use.

Accordingly, we conclude that petitioner is entitled to a deduction for the demolition loss in 1963 under section 165(a). *Panhandle State Bank*, 39 T.C. 813 (1963). *Jack M. Chesbro*, 21 T.C. 123 (1953), affirmed per curiam 225 F. 2d 674 (C.A. 2, 1955), certiorari denied 350 U.S. 995 (1956).

Respondent has not contested the correctness of the amounts of the expenditures for water, gas, electricity, fuel, and insurance in the amount of $255.12 and depreciation in the amount of $53.75, for 1963, but has contended that they were personal in nature. In view of our finding that the building was converted to property held for the production of income in October 1961, we hold that these items were deductible by petitioner under sections 167(a) and 212. Cf. *William C. Horrmann*, 17 T.C. 903 (1951).

It follows, therefore, that petitioner has made an overpayment of his taxes for 1963, and is entitled to a credit or refund. Sec. 6512(b).

*Decision will be entered under Rule 50.*