J. Alfred Rider and Graclynn Rider v. Commissioner.
Rider v. Commissioner
Docket Nos. 4463-68, 2208-69.
United States Tax Court
T.C. Memo 1971-43; 1971 Tax Ct. Memo LEXIS 289; 30 T.C.M. (CCH) 188; T.C.M. (RIA) 71043; March 9, 1971, Filed. *289 Petitioners purchased eight parcels of land in 1964 and one in 1965, and demolished the buildings thereon in 1966. Petitioners used the eight houses purchased in 1964 for rental purposes before demolishing them. Held, on the facts, petitioners did not intend at the time of purchase to demolish the buildings situated on the properties acquired in 1964; loss deduction allowed under sec. 165(a), I.R.C. 1954, as amplified by sec. 1.165-3(b)(1), Income Tax Regs., in amounts of the bases of the properties allocable to the buildings. Held, further, on the facts, petitioners intended at the time of purchase to demolish the structure located on the property purchased in 1965; loss deduction not allowed. Held, further, petitioners are entitled to deduct depreciation on the buildings during the periods they were rented, and deductions claimed therefor are allowed. Eugene J. Brenner and Richard J. Grillo, 1920 Mills Tower, San Francisco, Calif., for the petitioners. Edward B. Simpson, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' income tax: Docket No.
Year
Amount
4463-68
1963
$20,040.91
1964
13,178.70
2208-69
1965
21,676.84
1966
5,414.81
*290 The issues presented for decision are as follows: (1) Whether petitioners acquired any or all of nine parcels of real property with the intention at the time of purchase of demolishing the buildings situated thereon; (2) If the intention to demolish the buildings was formed subsequent to the acquisitions, what is the proper allocation of the bases of the parcels between the land and the buildings; and (3) Whether petitioners are entitled to deductions for depreciation on any of the buildings during tax periods prior to demolition. Findings of Fact J. Alfred Rider (hereinafter referred to as petitioner) and Graclynn Rider (hereinafter Graclynn), husband and wife, were legal residents of Mill Valley, California, at the time they filed their petitions. They filed joint Federal income tax returns for 1963, 1964, 1965, and 1966 with the district director of internal revenue, San Francisco, California. Petitioner is a doctor of medicine. In 1944, he received his M.D. degree from the University of Chicago and, in 1951, received a Ph.D. degree in pharmacology from the same institution. In 1953, he became an assistant professor of medicine on the staff of the University of California Medical *291 Center (hereinafter Medical Center) in San Francisco. In addition to serving on the faculty of the Medical Center, he carried on an extensive private medical practice during the years in issue. In 1957, petitioner carried on his private practice from an office located in the Medical Center, but he had been informed that his office privileges were being withdrawn. During that year, he purchased a house and lot at 374 Parnassus which he planned to renovate and use for office purposes. This property was located on the corner of Parnassus and Hillway Avenue, across the street from a portion of the Medical Center. Use of the building for medical offices required the lot to be rezoned. After two unsuccessful applications to the San Francisco City and County Planning Commission (Planning Commission) in October 1957 and April 1959, petitioner appealed to the Board of Supervisors (hereinafter sometimes Board) which has power to reverse the Planning Commission's action on individual rezoning applications. The Board overruled the Planning Commission and permitted the use of 374 Parnassus for medical offices and the operation of a pharmacy. When this building had been renovated and was ready *292 for occupancy, in June 1960, it provided office and related space for 189 petitioner and six other doctors, as well as facilities for a pharmacy. Petitioner moved into the building and rented the extra space. In October 1959, petitioner and Graclynn, in conjunction with another couple invested in two other houses, located at 378 and 382 Parnassus. These two parcels were situated to the west of, and adjacent to, 374 Parnassus; they were located in an area where there was a need for "guest houses" to provide quarters for out-patients and other hospital visitors. When these two parcels were purchased, they were being operated as guest houses, and petitioner continued to so operate them under a rental arrangement with Eleanor Samet. After the acquisition of these two pieces of property, petitioner requested John Kelley (Kelley), an architect, to do a study as to the most profitable use of all three lots, 374, 378, and 382 Parnassus. On considering several possibilities, Kelley finally advised that the best use of the three parcels of land, that is, the one producing the highest return, would be use for a medical office building, constructed by annexing new structures on 378 and 382 Parnassus *293 to the one already located on 374 Parnassus. Since petitioner's rental of medical offices at 374 Parnassus had been successful and there was a need for additional office space in the area, he decided to raze the buildings on 378 and 382 Parnassus and construct such an annex. In order to do this, however, rezoning of these two lots was required. Once again, the Planning Commission disapproved the applications which petitioner filed. He took an appeal to the Board of Supervisors and was successful; on February 13, 1962, 378 and 382 Parnassus were rezoned to permit their use as a medical office building. The University of California (University) opposed petitioner's application to rezone 378 and 382 Parnassus, primarily on the ground that the University's longrange development plan envisioned use of this property by the Medical Center, and because unresolved parking and traffic problems would be created by the proposed building. After the Board of Supervisors approved the rezoning, Dr. John Saunders (Saunders), the Provost of the Medical Center campus, requested that the Regents for the University of California (Regents) authorize condemnation proceedings to acquire these two parcels *294 of property. He advised that they would ultimately be needed by the University, and delaying their acquisition until after the proposed office facilities had been constructed would add materially to the costs. Saunders' recommendation was approved by the Regents, and on May 4, 1962, they filed a "Complaint in Eminent Domain" in the Superior Court for the City and County of San Francisco with respect to 378 and 382 Parnassus. In April 1963, the Superior Court ruled that the properties were subject to condemnation, and petitioner was subsequently awarded $82,548.20 for the parcels. In March 1962, petitioner purchased the property located at 1368 Arguello Street, approximately one-half block away from these other three parcels. After the property located at 378 and 382 Parnassus had been condemned, petitioner had funds, received from the condemnation, which he wished to invest, taking advantage of the nonrecognition of gain provisions of section 1033. [1] He thought guest houses, as well as other rental properties, were good long-term investments. He also knew that Eleanor Samet would be unable to continue to rent the houses at 378 and 382 Parnassus, and he wished to acquire other guest *295 houses for her to operate. In addition, petitioner had information at this time that the University would eventually take steps to condemn 374 Parnassus, and he was looking for property which he could use for his office. Since he had developed a good practice in the area near the Medical Center, retaining his office in this vicinity was obviously to his advantage. During 1964, petitioner acquired the following properties near the Medical Center on the dates and for the prices shown, obtaining purchase loans in the amounts indicated: Purchase Price
Date of
(Cost Basis at
Amounts of
Property
Acquisition
Time of Purchase
Loans
354 Parnassus
1/31/64
$39,356.83
$30,000.00
364 Parnassus
4/14/64
36,567.30
25,600.00
29 Hillpoint Court
7/ 2/64
50,313.00
40,000.00 190
352 Parnassus
8/ 3/64
$69,540.60
$37,000.00
358 Parnassus
8/ 3/64
65,107.30
37,000.00
360 Parnassus
9/ 3/64
64,448.90
37,000.00
52 Hillway Avenue
9/24/64
66,944.10
34,500.00
46 Hillway Avenue
10/23/64
45,347.90
32,000.00 190 The circumstances in which each of these properties was acquired are set forth below. Lou Walker, a real estate agent, *296 brought to petitioner's attention the first two properties, 354 and 364 Parnassus which he purchased on January 31, 1964, and April 14, 1964, respectively. He immediately rented both properties, one to a tenant and the other to Eleanor Samet for guest house use. He purchased additional furniture for the house used by Eleanor Samet. Petitioner acquired another piece of realty at 50 Noe Street, not included in the above list, in March 1964. This property is located in the vicinity of Franklin Hospital, about 2 miles from the Medical Center, where some of his patients received hospital care. Petitioner planned to hold this property for rental purposes; however, he also intended to retain it as a possible alternative location for his medical office in the event he was unable to find suitable space near the Medical Center. Walker also brought to petitioner's attention the house located at 29 Hillpoint Court, which petitioner purchased on July 2, 1964. This property was located in the same block as the other two parcels, 354 and 364 Parnassus, but faced a street which ran perpendicular to Parnassus at the east end of the block. The house had already been converted into several apartments, *297 and petitioner continued to rent them. By this time the Regents had filed a suit in a San Francisco court, seeking an order of condemnation with respect to 374 Parnassus, and petitioner thought this house would be suitable for an office building. At petitioner's request, a floor plan for possible conversion of the property into offices was prepared by a member of Kelley's architectural firm. Also, at petitioner's suggestion, the pharmacist who was renting space in 374 Parnassus inspected the garage located on these premises with a view to converting it into a pharmacy. On August 3, 1964, petitioner purchased the parcels of real estate located at 352 and 358 Parnassus. Both of the houses were in excellent condition. The previous owner of 352 Parnassus was a carpenter who had done much repair and remodeling work. After acquiring this property, petitioner by agreement allowed the prior owner to remain there for several months and then rented it to five nurses. The former owner of the other house had died, and his widow, who had remarried, came to petitioner and offered to sell it to him. He arranged for Eleanor Samet to operate it as a guest house, and purchased and supplied her with *298 the needed furniture. The house situated at 360 Parnassus was brought to petitioner's attention by a real estate agent representing the owner. Petitioner inspected this property, decided to buy it, and closed the purchase on September 3, 1964. The property was then either rented or operated as a guest house. After this acquisition, petitioner, for the first time, owned contiguous frontage along this block of Parnassus. On September 24, 1964, petitioner closed the purchase of the 52 Hillway Avenue property, located on an avenue which ran perpendicular to Parnassus at the west end of the block. This property was in very good condition, and he rented it to some medical students. Shortly thereafter, on October 23, 1964, he purchased the house and lot at 46 Hillway Avenue. This house was not in good condition, but he rented it also. When petitioner obtained each of these eight parcels, bounded by Hillway Avenue on the west and Hillpoint Court on the east, he was required to secure financing. Seven of the eight purchase money loans were procured from Bay View Federal Savings and Loan Association (Bay View). Each of these loans was payable over a term of 20 years or more, and each loan agreement *299 contained a prepayment penalty - in other words, at the time petitioner obtained each loan he agreed to pay a penalty if he repaid the loan before it was due. Under Bay View's policies, a waiver of an agreed prepayment penalty is permitted only in "hardship cases." In 191 addition, as each piece of property was acquired, petitioner obtained fire damage, vandalism, and extended coverage insurance, and each insurance policy was effective for a 3-year period. During and subsequent to the purchase of the eight parcels of land enumerated above, petitioner inspected numerous other parcels with a view to acquiring them for investment purposes. Included among these was a guest house on Parnassus several blocks to the west of the Medical Center. However, this piece of property was not advantageously located for rental as a guest house, and petitioner did not purchase it. He purchased other pieces of property in the vicinity of the Medical Center both during and after this period. Among the purchases were the following: Date of
Property
Acquisition
Purchase Price
443 Carl
11/ 5/65
$ 67,000.00
374 Carl
3/22/66
103,000.00
16 Hillway
5/ 4/66
31,000.00
10 Hillway
5/ 4/66
31,000.00
34 Hillway
8/31/66
36,000.00
22 Hillway
9/15/66
32,500.00
40 Hillway
10/31/66
36,000.00
28 Hillway
11/15/67
34,000.00
415 Carl
10/ 9/68
145,000.00
7 Hillpoint
6/26/69
47,500.00
15 Hillpoint
6/30/69
50,600.00
21 Hillpoint
6/30/69
47,500.00
*300 In late January 1964, petitioner contacted Kelley, who had done the feasibility study and prepared the plan for converting 378 and 382 Parnassus into a medical office annex, and informed him that he had acquired certain property on Parnassus in the block immediately to the east of 374, 378, and 382 Parnassus. Petitioner asked Kelley to do a minimum-type feasibility study to determine what, if anything, should be done with the property. The purpose of this study was to explore all possibilities in order to determine the best and most economical use of the land. Since this initial exploration did not involve any substantial plans or any specific pieces of property, Kelley proceeded to analyze various possibilities, including remodeling some of the houses for medical offices, demolishing buildings, and continuing the uses to which the properties were then devoted. He initially concluded that the most economical use was to continue to rent the houses or operate them as guest houses in their current condition. Kelley kept petitioner informed in a rather general way with regard to the feasibility studies he was doing. In August 1964, after considerable experimentation with various designs *301 and possible combinations, Kelley's office developed a preliminary plan for a proposed 9-floor office building to be located on the Parnassus Avenue properties. Taking into account the building code requirements keying office space to automobile parking space, Kelley was of the opinion that an office building constructed on those properties should consist of nine floors. Petitioner was not informed of this proposed project until Kelley had prepared a model and had made a feasibility analysis demonstrating the most economical use of the land. Petitioner first saw the proposal for the building in September 1964, and he was astonished by the enormity of the proposal. At the time this plan was first presented to petitioner, the zoning for the lots which he had acquired on Parnassus was "R-3," and this classification would not permit use of the land for a medical office building. In late October 1964, Kelley, as authorized agent for petitioner, filed an application with the Planning Commission for rezoning the block from "R-3" to "R-4" so that the properties could be used for professional offices. An application was also filed for a conditional permit to use the eight parcels which he had *302 acquired for the construction of a medical office building. After holding hearings on the applications, the Planning Commission, on December 10, 1964, disapproved them. On or about December 18, 1964, petitioner filed an appeal with the Board of Supervisors. On February 12, 1965, the Board reversed the Planning Commission and granted the petition to rezone, as well as the requested conditional use permit. Thereafter, two residents in this area petitioned the Planning Commission to rezone the property from "R-4" to "R-3," and the Planning Commission did so. Again, petitioner appealed to the Board of Supervisors and in July 1965 it reversed the order of the Planning Commission. On May 6, 1965, petitioner purchased the property located at 350 Parnassus for the price of $75,573.30. This house had been designed and built by its owner with special attention to architectural details and was in excellent condition. Petitioner secured from Bay View a loan in the amount of $37,000 for the purchase of this property. At the time of this last purchase, petitioner was still looking for a location for 192 his medical office since he would be required to move from the condemned building located at *303 374 Parnassus. The building at 350 Parnassus was well constructed and in good condition, and petitioner instructed Kelley's office to prepare plans for converting it into a medical office. Although petitioner wished to move into the new building when and if it was completed, he needed a temporary location in the vicinity. He also hoped that he would be able to rent space in the remodeled building to doctors who would not wish to pay the rental prices which would be required in the new office building. The suitability of this building for rental to such doctors was enhanced by its location directly across the street from the Langley-Porter Clinic, a psychiatric institute. In the original plan for the new building submitted to the Board of Supervisors for obtaining the conditional use permit in February 1965, parking facilities located under Parnassus Avenue were contemplated. At the hearing on the conditional use permit on December 3, 1964, the Director of the Planning Commission noted that any permit for use of space for parking under Parnassus would "require revocable permission from the Board of Supervisors." He stated that, since a permit for understreet parking might come in conflict *304 with an underpass beneath Parnassus which was proposed by the University, this permission might be jeopardized at any time. As construction plans for the building developed, inquiries were made by Kelley and his associates concerning the permit for understreet parking. The information noted by the Director of the Planning Commission at the hearing in December 1964 proved to be correct. Petitioner knew that if his permit for understreet parking was revoked he would not have adequate space for parking. In view of these facts, a plan was then prepared by Kelley's office to provide the needed parking at the site of 350 Parnassus. Although petitioner still wished to convert this piece of property into a separate office building, he finally consented to allowing inclusion of this land in the construction plan. In September 1964, when Kelley presented the original plan for the 9-floor medical building, petitioner did not have the necessary financing to undertake the project and had taken no steps to arrange it. Not until after he had acquired all of the first eight parcels and had reviewed Kelley's plans, did he inquire into the possibilities for financing such a building. His initial inquiries *305 indicated that the financing would not be available because the property involved in the proposed building was heavily mortgaged, and, in order to obtain the necessary money for construction, the land had to be free and clear. This required capital to pay off the mortgages, as well as to cover the cost of the proposed building, and for many months the funds did not appear to be obtainable. In late 1965, Salvador Dito (Dito), manager of the Haight-Clayton branch office of the Bank of America, acting on information he had received from the bank's main office that approval had been granted for the new building, attempted to contact petitioner concerning the possibility of placing a branch of Bank of America in the proposed medical building. After a number of unsuccessful attempts, Dito finally met with petitioner in December 1965. At that meeting and subsequent ones, petitioner agreed to attempt to arrange for Bank of America to have space for a branch office in the building, and the Bank agreed to supply the funds needed to free the land from the mortgages and to provide for the proposed construction. After financing arrangements were concluded with the Bank of America, the plans for *306 the building were completed. In January 1966, the buildings at 350, 352, 354, 358, 360, and 364 Parnassus, 29 Hillpoint Court, and 46 and 52 Hillway Avenue were demolished, and construction of the medical office building followed. Of petitioner's total purchase price (cost basis at time of purchase) for each parcel, the portions thereof allocable to the land and buildings are as follows: Property
Land
Buildings
354 Parnassus
$10,075.35
$29,281.48
364 Parnassus
10,092.57
26,474.73
29 Hillpoint Court
16,771.00
33,542.00
352 Parnassus
20,862.18
48,678.42
358 Parnassus
19,532.19
45,575.11
360 Parnassus
19,334.67
45,114.23
52 Hillway Avenue
22,314.70
44,629.40
46 Hillway Avenue
11,336.97
34,010.93 The section 1033 adjustment of the bases of these properties is allocable to the land and buildings in the same proportion as set forth above. *
In his income tax return for 1966, petitioner claimed an abandonment loss for the 193 property that was demolished; claimed depreciation on the buildings for 1964 and 1965, and filed an application for tentative net operating loss carryback adjustments from 1966 *307 to 1963 and 1964. Respondent in his notices of deficiency disallowed the abandonment loss for 1966, and disallowed the claimed depreciation for 1964 and 1965; as a result of these adjustments, the tentative net operating loss carryback was determined to have been improper. Ultimate Findings of Fact Petitioner did not form an intention to demolish the buildings on 352, 354, 358, 360, and 364 Parnassus, 29 Hillpoint Court, and 46 and 52 Hillway, within the meaning of section 165 and related regulations, until sometime after October 23, 1964. Petitioner intended to demolish the building on 350 Parnassus at the time he acquired it. While rented, the buildings which were demolished depreciated at a rate computed by reference to a useful life of 15 years. Opinion In the notices of deficiency, respondent denied petitioner any deduction for a demolition loss under section 165 in respect of the nine houses which were razed to provide space for the new medical building on the theory that petitioner intended to demolish these houses at the time he purchased them. This determination is based on the proposition that, after petitioner's plan to annex 378 and 382 Parnassus to 374 Parnassus was thwarted *308 by the University's condemnation proceedings, he decided to construct a new medical office building, immediately to the east of 374 Parnassus, and, pursuant to that decision, purchased all the nine houses in dispute with the intention of demolishing them. The deductibility of alleged demolition losses depends upon section 165(a), which allows as a deduction "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Amplifying this statutory language, section 1.165-3(a)(1), Income Tax Regs., states, in part, that if real property "is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon: No deduction shall be allowed under section 165(a) on account of the demolition of the old buildings * * *." See Hillside National Bank, 35 T.C. 879 (1961). However, section 1.165-3 (b)(1) of the Regulations provides that "if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished," the loss incurred in demolishing the buildings shall be allowed as a deduction under section 165(a). Andrew F. McBride, Jr., 50 T.C. 1 (1968). The issue posed by these regulations *309 - petitioner's intention at the time of the acquisitions - is purely factual and must be resolved by taking into account all the facts and circumstances. "Rarely does a man have an intention which he is not prepared to yield to circumstances"; our task is, therefore, to ascertain petitioner's "dominant intention," intention," i. e., the "intention or purpose to be followed under circumstances which are foreseen as more probable than not." Meyer v. United States, the urging of their brother Harry, formed a partnership named Eagle Realty Assocites 247 F. Supp. 939, 944 (D. Mass. 1965), affirmed per curiam 362 F. 2d 264 (C.A. 1, 1966). Respondent quite correctly points out that the Regents' condemnation proceedings in 1962 had frustrated petitioner's plan to construct a substantial office building. Also, after these condemnation proceedings were instituted, petitioner knew that the Regents would eventually take steps to condemn his 374 Parnassus office building; indeed, by July 1964, the Regents had instituted such a condemnation suit, and petitioner knew he would be required to find new quarters for his office. With knowledge of all these facts, petitioner purchased the disputed properties *310 and then razed the structures thereon and constructed the new office building. We do not think, however, that these facts, when considered in the light of the record as a whole - including petitioner's preparation and study of plans to use one of the buildings for the office space he would need when he lost 374 Parnassus; his acquisition during this same general period of similar rental properties which he still held at the time of the trial; his knowledge of the militant opposition of both the Planning Commission and the Medical Center to rezoning land across the street from the hospital for office use, and the manner in which he proceeded in acquiring the properties - support an inference that the first eight of the nine disputed properties were "purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon" within the meaning of section 1.165-3(a)(1) of the Regulations. To the contrary, we think the evidence 194 shows that retention of these eight properties as an investment was foreseen as more probable than not, and that the demolition occurred as a result of a plan formed subsequent to the acquisitions. Petitioner was firmly convinced *311 that the purchase of real estate was a good investment, and he had a large income from his medical practice and the proceeds of the condemnation of 378 and 382 Parnassus, as well as the anticipated condemnation proceeds of 374 Parnassus, to invest at the time he started acquiring these properties. The condemnation awards gave him substantial capital gains on which he could defer the tax by reinvesting the proceeds within the period prescribed by section 1033. He thought he could use one or the other of these properties for office purposes. Pursuant to his request, an architect prepared plans for converting 29 Hillpoint Court, already remodeled as an apartment building, into office facilities; his consideration of this possibility progressed to the point of negotiating with the pharmacist to whom a portion of 374 Parnassus was rented concerning the conversion of the garage into quarters for the pharmacy. These facts alone tend to negate any initial intent to destroy the house. Adolph B. Canelo III, 53 T.C. 217, 229 (1969), on appeal (C.A. 9, June 1, 1970). Since the lot at 29 Hillpoint Court was an essential part of the site on which the building was ultimately constructed, the fact *312 that he evidently intended initially to use this property for office purposes tends to show that he did not intend to demolish the buildings on any of these eight lots at the time he bought them. Furthermore, petitioner did not confine his search for investment property to the houses which he eventually demolished. During the period before, during, and after he acquired the nine parcels in dispute, he looked at numerous other parcels. Between 1965 and 1969, he acquired twelve other properties; most of them were situated in the same block as the disputed properties, and the others were located in an adjacent block. Indeed, these acquisitions included all the lots in the block facing Hillway Avenue. He still owned these other properties at the time of the trial. Although it appears that his rental buildings did not produce a net profit in 1964 and 1965, his primary concern was not only with an immediate return but with the long-term increment in value as well. Quite obviously, the properties in dispute were as well located for rental purposes as the other properties which he acquired and retained. In addition, numerous major obstacles stood in the way of constructing an office building *313 on these parcels of land. Petitioner had faced the persistent opposition of the University officials when he sought to have 374 Parnassus, as well as 378 and 382 Parnassus, rezoned for office use, and in each instance the Planning Commission had denied his request. All of the major objections to these prior rezoning requests except the Medical Center's desire to acquire the properties - traffic congestion, parking problems, and commercialization of the residential neighborhood - were certain to be presented again and would be accentuated by a proposal to construct a large, entirely new building. Although there is some evidence suggesting that an effort had been made to lead petitioner to believe that the University officials had indicated its willingness to consent to the rezoning of these new acquisitions, the representations in this respect appear to have reflected efforts to settle disputes related to the prior condemnation suits. There was obviously no commitment by the University officials since they vigorously opposed his rezoning petition when it was ultimately filed. The evidence shows that the University's land acquisition plans were fluid, and petitioner's relationships with *314 the Medical Center officials were severely strained by long-term disagreements; he had no reason to be sanguine with respect to the University's position on rezoning. While he had succeeded in convincing the Board of Supervisors to reverse the Planning Commission's decision on his first two applications, it seems improbable that he would have made the large investments here in dispute with confidence that he would be successful on a third appeal. Moreover, petitioner took no real steps to arrange financing for the construction of the new building until late 1964. Even then his initial efforts were not successful. Since he had placed substantial mortgages on each property as it was acquired, an extremely large loan was needed. Not until December 1965, more than a year after the last of the first eight parcels was purchased, was financing obtained through Bank of America. Finally, the manner in which petitioner proceeded in acquiring the first eight parcels is inconsistent with an intention to 195 demolish the buildings. He made the acquisitions in checkerboard fashion and did not acquire contiguous frontage along this block on Parnassus until September 3, 1964, when he bought the property *315 located at 360 Parnassus. Several of the properties were brought to his attention by the owners or their representatives; he did not take the initiative. The mortgages which he gave to secure the purchase moneys were payable over a period of at least 20 years, and each mortgage provided for a prepayment penalty. For two of the houses which were operated as guest houses, petitioner bought additional furniture. In addition, with respect to each property, he obtained insurance policies covering a 3-year period. All of these facts are inconsistent with a dominant intention to demolish the buildings at that time. As to 350 Parnassus, however, our conclusion is not the same. As noted above, in ascertaining petitioner's dominant intention, the standard is the "intention or purpose to be followed under circumstances which are foreseen as more probable than not." Meyer v. United States, supra at 944. By the time the rezoning was ordered in February 1965, we think he had decided to go ahead with the construction of the building even though several problems remained unsolved. Petitioner contends that the parking problem, which required the use of 350 Parnassus for the new building site, did not *316 develop until sometime after May 1965, when this property was acquired. As early as December 1964, however, he had learned from the Director of the Planning Commission that his permit for understreet parking would be revocable. His past strained relationships with University officials - culminating in 1966 in his ouster from 374 Parnassus - left him no reason to expect them to give him any special consideration in deciding whether to revoke his permit when the University built its proposed tunnel under Parnassus. Even though he had plans prepared for converting the 350 Parnassus house to office use, cf. Adolph B. Canelo III, supra, and, no doubt, would have preferred to devote it to that use, the evidence supports the inference, be believe, that when he acquired that house and lot he thought it "more probable than not" that he would ultimately decide as a matter of business judgment, to demolish the building as a solution of the parking problem. True, there is evidence to the contrary; but, on balance, we think the preponderance of the evidence supports our finding. Both parties have submitted expert testimony on the value of the buildings in relation to the land at the time the *317 properties were acquired. Our Findings reflect our conclusions on this issue. We have adopted the appraisals made by Bay View at the time petitioner obtained the loans to acquire the properties. We think their contemporaneous appraisals, unrelated to tax consequences, and supporting testimony most persuasive. As to the depreciation issue, the notices of deficiency advised petitioners that "you are not entitled to deduct any depreciation" on the buildings "for the reason that you have not established what part, if any, of their adjusted bases * * * should be allocated to depreciable improvements, or the rate of depreciation thereon, as required by section 167 of the Internal Revenue Code." Our Findings as to the portion of the cost of the properties allocable to the buildings and the parties' stipulation as to the section 1033 adjustments are sufficient to permit a computation of the adjusted bases for depreciation purposes. While there is no specific evidence as to the rate at which these particular houses depreciated, we think it obvious that, like any other rental property, they deteriorated through use. In the notices of deficiency, respondent determined allowable depreciation on *318 the house located at 57 Noe Street - comparable rental property - by employing a rate based on a useful life of 15 years. Accordingly, for the period before the Court, depreciation, computed by using the same rate, is allowable on the houses in dispute. Decisions will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.↩
*. By official Tax Court order, dated April 15, 1971 and signed by Judge Featherston↩, this paragraph was replaced. - CCH.