ADOLPH B. CANELO III AND SALLY M. CANELO, PETITIONERS *v.* COM-
MISSIONER OF INTERNAL REVENUE, RESPONDENT
THOMAS J. KANE, JR., AND KATHRYN H. KANE, PETITIONERS *v.* COM-
MISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 894–65, 895–65.   Filed November 12, 1969.

*Jack H. Olive*, for the petitioners.
*Harry Morton Asch* and *Robert D. Forrester*, for the respondent.

DAWSON, *Judge:* In these consolidated cases respondent deter-
mined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 894–65 | Adolph B. Canelo III and Sally M. Canelo | 1960 | $1, 563. 86 |
| | | 1961 | 3, 172. 89 |
| | | 1962 | 1, 503. 03 |
| 895–65 | Thomas J. Kane, Jr. and Kathryn H. Kane | 1960 | 6, 517. 35 |
| | | 1961 | 12, 403. 14 |
| | | 1962 | 1, 305. 23 |

Certain minor adjustments have been conceded by petitioners, leav-
ing the following issues for decision: (1) Whether a law partnership
on a cash basis of accounting may properly deduct under section
162(a)[1] various litigation costs advanced to clients under contingent-
fee contracts, where the recovery of such costs is contingent upon
the successful prosecution of the claim; (2) whether petitioner Kane
purchased certain parcels of real estate intending to remove the
buildings situated thereon and, if not, whether he properly allocated
the purchase prices between land and buildings; and (3) whether
petitioner Canelo properly allocated the purchase price of certain

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise
indicated.

real estate between land and building for depreciation deduction purposes.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Adolph B. Canelo III and Sally M. Canelo, petitioners in docket No. 894–65, are husband and wife. At the time their petition was filed in this proceeding their legal residence was Merced, Calif. They filed joint Federal income tax returns for calendar years 1960, 1961, and 1962 with the district director of internal revenue, San Francisco, Calif.

Thomas J. Kane, Jr., and Kathryn H. Kane, petitioners in docket No. 895–65, are husband and wife. At the time their petition was filed in this proceeding their legal residence was Merced, Calif. They filed joint Federal income tax returns for calendar years 1960, 1961, and 1962 with the district director of internal revenue, San Francisco, Calif.

Thomas J. Kane, Jr., and Adolph B. Canelo will be referred to individually as Kane and Canelo and together as petitioners.

*Facts Relating to Claimed Deductions for Advanced Litigation Costs*

Kane and Canelo are attorneys at law, licensed by the State of California. They have been in partnership since October 1, 1959. The partnership filed its tax returns on a calendar year basis, using the cash method of accounting. The major portion of the partnership practice has been in the field of tort liability and personal injury litigation. Virtually all of this litigation is handled under contingent-fee contracts, which provide that "the attorneys will advance the necessary court costs and expenses and cost of investigation in the prosecution of this claim." In the event of a judgment or settlement in favor of the client, the advanced costs will be repaid out of the proceeds. In addition, the attorney is entitled to a percentage of the proceeds "as sole compensation for services rendered." But if the case is lost and there is no recovery, it is understood that the client owes nothing for either fees or costs.

In California a contingent-fee contract having the provisions:

(1) That the attorney is to advance all the expenses necessary for the preparation of the case and for court costs,

(2) That the attorney is to receive a percentage of the amount of recovery remaining after the deduction of the costs, and

(3) That if there is no recovery the attorney is to receive nothing for his services or for costs advanced,

is a lawful contract which the courts will protect from interference by outside parties. *Herron* v. *State Farm Mutual Ins. Co.*, 363 P. 2d 310 (Cal. Sup. Ct. 1961). Such a contract and practice is used by petitioners as well as by other attorneys engaged in personal injury litigation in California. The necessity for this practice lies in the inability of most clients to supply the costs, and the competitive necessity among attorneys engaged in a personal injury practice requires that the attorney advance costs or lose prospective clients to other attorneys who will.

The financial risk of litigation is thereby shouldered by the attorney; the client puts up no money. Naturally the attorney screens prospective clients in an effort to reduce his risk. The law firm of Kane and Canelo takes cases when it has "good hopes" of recovery. In 1960 the firm made advances of which $6,924.93 was outstanding at the end of the year. In 1961 and 1962, $6,232.87 (90 percent) of that specific amount was recovered. This is a reasonably reliable measure of their "good hopes."

The types of costs advanced by petitioners' law firm include travel expenses, costs of medical records, reports, interpreters' fees, witness fees, deposition costs, filing fees, investigation costs, photographs, laboratory tests, and sheriff's fees for service. All such expenditures are posted to the particular client's file involved for eventual billing purposes. Petitioners ordered the services of process servers, shorthand reporters, investigators, doctors, and expert witnesses to whom litigation costs were paid. The persons billed the partnership and the partnership approved and paid the bills without consulting the client. The partnership never advanced money to a client for personal and living expenses on a case in progress.

On its tax returns for 1960, 1961, and 1962 the partnership deducted the advanced litigation costs in the years in which they were paid. In the event of recovery, the litigation costs were reported as income in the year of recovery.

Respondent made the following adjustments in partnership income:

| | 1960 | 1961 | 1962 |
|---|---|---|---|
| Disallowance | $6,924.93 | $17,154.72 | $18,471.82 |
| Offset | | 5,122.29 | 14,561.42 |
| Net adjustment | 6,924.93 | 12,032.43 | 3,910.40 |

Respondent disallowed deductions for litigation costs furnished in each of these years where the costs remained outstanding on December 31. When costs were advanced and received in the same year, the transactions were treated as a "wash" and no adjustment was made.

When advances were recovered in later years respondent offset income by that amount. If the case closed without recovery, a loss was allowed in the later year. The basis for these adjustments was that the advances were in the nature of loans to clients, and thus not deductible as ordinary and necessary business expenses under section 162(a).

The contested disbursements for advanced litigation costs made by the partnership during the years 1960, 1961, and 1962 are not ordinary and necessary business expenses. The partnership is not entitled to deductions for reasonable additions to a reserve for bad debts during the years in issue. The partnership is entitled to adjustments for offsets of litigation expenses paid prior to 1960 in the amounts of $2,601.66 for 1960, $486.51 for 1961, and $863.31 for 1962.

*Facts Relating to the Claimed Loss on the Building at 560 W. 22d Street*

Kane terminated his 7-year association with his partner Willard B. Treadwell on July 1, 1958. They practiced in the Crocker Bank Building in Merced. About the time Kane decided to end this partnership, he became interested in purchasing property at 560 West 22d Street, Merced, Calif. (hereinafter referred to as 560 or the 560 property).

The 560 property consisted of a corner lot, 70 feet by 150 feet, with a one-story, three-bedroom, one-bath residential dwelling in good condition. Facing the property across the street was the courthouse; across 22d street was a public school administration building. The surrounding area was primarily residential, but was located on the fringe of the business district. Both the location and the zoning were suitable for professional and office building use.

Kane received a report dated April 10, 1958, from the Stanislaus Merced Savings & Loan Association appraising the property at $10,100, allocated $5,650 to improvements and $4,500 (sic) to land. Petitioner paid $20,336.55 for the property on May 12, 1958, and allocated $12,836.55 of the purchase price to the building and $7,500 to the land. In March 1958, 1959, and 1960, the property was assessed at $3,300, $2,100 for the building and $1,200 for the land.

Purchase of the 560 property was financed by a mortgage on the premises and by $10,000 borrowed on Kane's home.

Kane rented the property to the seller until November 1958, when the seller's new quarters were completed. In November 1958, Kane leased the property on a monthly basis as a residence for $125 per month. It remained so occupied until June 1960. During that period Kane paid $142.90 for a fence and about $16.50 for minor repairs.

On June 25, 1959, Kane applied for a zoning variance which would waive setback requirements on the 560 property. The minutes of that hearing indicate that he intended to construct an office building on the property. Subsequently he did remove the house and had an office building constructed on the property.

After preliminary discussions in April or May of 1959, Kane entered a partnership with Canelo on October 1, 1959.

Kane never obtained any formal plans or estimates for remodeling the residence for offices, but he did receive rough estimates that the cost would be about $5,000.

Respondent disallowed a claimed loss deduction of $8,723.45 resulting from the sale and removal of the 560 building and determined that there was a gain of $1,850.10 on the sale.

Kane had no intention of demolishing the 560 building and had no intention of moving or selling the structure at the time he acquired it in May 1958. He began to form the plan that required removal of the residence about 1 year after purchase, in 1959, but that plan did not mature until February 1960 when the California Pacific Title Insurance Co. became interested in occupying the property and the actual sale of the dwelling house in August 1960 to the Roman Catholic Bishop of the Monterey-Fresno Diocese for a price of $3,000.

The cost basis of the building on the 560 property when Kane purchased it was $5,700.

*Facts Relating to Claimed Loss and Depreciation on the Building at 548 W. 22d Street*

In August 1959, Kane contacted an architect with regard to designing a building for the 560 property.

In February 1960, Kane learned the California Pacific Title Insurance Co. needed office space in the Merced area. A building large enough to accommodate both the title company and the law firm of Kane and Canelo required a site larger than the 560 property.

On April 4, 1960, Kane obtained an option on the property at 548 W. 22d Street. The 548 property was 65 feet by 150 feet; the combined 548 and 560 properties measured 135 feet by 150 feet.

Situated on the 548 property was a two-story, nine-room residence, in good condition, with one and one-half baths, a basement, and a detached garage. Kane purchased the 548 property on August 15, 1960, for $29,393.70.

Kane allocated the price of the 548 property $10,802.31 to land, $18,456.39 to building, and $453 to furniture.

Kane received a report dated June 24, 1960, from the Merced Mariposa Savings & Loan Association appraising the 548 property at $25,472, allocated $15,472 to improvements and $10,000 to land.

In a report dated August 10, 1960, the Stanislaus Merced Savings & Loan Association appraised the combined 560 and 548 properties at $30,950, allocating $15,950 to improvements and $15,000 to land.

In March 1960, the assessed value of the 548 property was $4,640, allocated $3,670 to the building and $970 to the land.

Kane insured the 548 building for $15,000.

The house on the 548 property was in good condition. Kane purchased a television antenna from Graham, the seller, and purchased curtains from Graham's wife.

On September 15, 1960, Kane leased the 548 property as a residence at $125 per month on a month-to-month basis.

On August 1, 1961, Kane applied for a conditional use permit for the combined 548 and 560 properties. This application, as submitted and approved August 9, 1961, contemplated construction of an 8,250-square-foot office building and the continued existence of the 548 structure. Kane paid an architect $2,500 for preliminary plans relating to such application. Kane did not build pursuant to the approved application because the parking plans as finally approved destroyed the usefulness of the 548 building as a residence.

On October 16, 1961, the City of Merced increased off-street parking requirements substantially.

On October 26, 1961, Kane gave the tenants in 548 60 days' notice to vacate and offered to sell the building to them. Kane sold the house to a house mover in December 1961.

In February 1962, Kane applied for permission to construct a professional office building of 12,000 square feet. The application was approved and the building was later completed. Kane paid the same architect $4,500 for these plans.

Respondent disallowed claimed deductions for depreciation of the 548 building and for the loss resulting from its removal:

|  |  | Disallowed |
|---|---|---|
| 1960 | Depreciation | $395. 75 |
| 1961 | Depreciation | 949. 82 |
|  | Loss on sale | 17, 049. 07 |

Kane intended to continue the use of the residence on the 548 property at the time is was purchased in August 1960. Subsequently, in October 1961, he abandoned that plan and formulated a new plan which required the removal of the residence.

The cost basis of the building on the 548 property when Kane purchased it was $12,861.

*Facts Relating to Claimed Depreciation on the Building at 549 W 21st Street*

In September 1961, Canelo purchased improved real property at 549 West 21st Street, Merced, Calif., for $25,208.28. He allocated the purchase price $12,649.14 to the building and $12,559.14 to the land. The building is a two-story residence, built about 1900. Canelo rented the property in 1961 and 1962, incurring cash losses before taking depreciation.

Prior to purchasing the property, Canelo received a report from a Mr. Fitzgerald, a member of the American Institute of Real Estate Appraisers, appraising the property at $25,300, allocated $14,450 to land and $10,850 to improvements.

The 549 property was assessed in 1960 at values of $1,120 for land and $2,250 for improvements. In 1961 the assessment values were $2,000 for land and $1,500 for improvements.

In September 1961, the improvements were insured for $14,000.

Various appraisals by different savings and loan associations allocated values as follows:

| Date | Land (Percent) | Building (Percent) |
|---|---|---|
| Apr. 13, 1962 | 33 | 67 |
| May 16, 1962 | 40 | 60 |
| May 20, 1964 | 43 | 57 |

Respondent disallowed Canelo's claimed deductions for depreciation in 1961 and 1962 to the extent that they were computed on a cost basis for the building exceeding $10,850.

The cost basis of the building on the 549 property when Canelo purchased it was $12,649.14.

## OPINION

1. *Advanced Litigation Costs.*—The essential facts with respect to this issue are not in dispute. Petitioners contend that personal injury law practice in California is customarily carried on by the attorney incurring, paying, and bearing the risk of loss of litigation costs and that such costs are for the attorney's own account with no obligation of the client to repay. Consequently, they argue that the litigation costs they advanced during the years in question constitute ordinary and necessary expenses under section 162(a)[2] of carrying on their personal injury law practice. Respondent, on the other hand, characterizes the expenditures as being in the nature of loans because

---

[2] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

petitioners have a right of reimbursement from their clients. "It has been firmly established that where a taxpayer makes expenditures under an agreement that he will be reimbursed therefor, such expenditures are in the nature of loans or advancements and are not deductible as business expenses." *Josef C. Patchen*, 27 T.C. 592, 600 (1956). Accord, *Levy* v. *Commissioner*, 212 F. 2d 552 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court; *Glendinning, McLeish & Co.*, 24 B.T.A. 518 (1931), affd. 61 F 2d 950 (C.A. 2, 1932); *Henry F. Cochrane*, 23 B.T.A. 202 (1931). The *Cochrane* case involved an attorney who claimed a deduction for expenditures essentially the same as those involved in this case: filing fees, investigation costs, and traveling expenses.

Petitioners seek to escape the rule of these cases by relying on the contingent nature of their right of reimbursement. This Court, however, has previously held that living expenses and medical expenses advanced to clients under contingent fee (and contingent reimbursement) contracts are in the nature of loans and thus not deductible under section 162(a). *Warren Burnett*, 42 T.C. 9 (1964), affirmed and remanded 356 F. 2d 755 (C.A. 5, 1966), certiorari denied 385 U.S. 832 (1966); *Reginald G. Hearn*, 36 T.C. 672 (1961), affd. 309 F. 2d 431 (C.A. 9, 1962), certiorari denied 373 U.S. 909 (1963). In our opinion those cases are not distinguishable, as petitioners suggest, as instances of mere money-lending, unrelated to the taxpayer's law practice. The plain holding of the *Burnett* case is that "petitioner's expenditures constituted advances to his clients which were virtually certain to be repaid and, consequently, were not deductible as business expenses." 356 F. 2d at 759. The Court of Appeals pointed out that the requirements of a loan for purposes of section 166 do not determine what constitutes an ordinary and necessary business expense under section 162(a). In view of petitioners' practice of screening clients and their "good hopes" of recovery, we think it is clear that the advances herein were intended to, and did, operate as loans rather than expenses under section 162(a).

In seeking to characterize the expenditures made on behalf of clients in these cases as ordinary and necessary business expenses, petitioners introduced evidence to establish that it is the practice and custom of personal injury attorneys to make disbursements or advancements on behalf of their clients. Although we have accepted the factual establishment of such a custom in California, it is not sufficient to result in a determination that the litigation expenditures were deductible business expenses. In the *Burnett* case the Court of Appeals expressly noted that it is the custom among attorneys representing plaintiffs in Texas, where Burnett practiced, to make the

contested disbursements on behalf of their clients. This fact in the *Burnett* case of such a custom was not relevant to or determinative of the issue of deductible expenses. See also *Charles E. Albright*, 16 B.T.A. 1228 (1929).

Petitioners attempt to distinguish the *Burnett* case on the ground that it involved advances of significant amounts of money for living expenses. Certainly the amount of the expenditure does not determine whether the advances fall into the category of deductible business expenses. And, as we view it, the different *uses* of the advanced funds is a distinction without substance. What is important is the nature of the facts and circumstances under which the expenditures are made. If expenditures are made with the expectation of reimbursement, it follows that they are in the nature of loans, notwithstanding the absence of formal indebtedness. See and compare *Henry F. Cochrane*, *supra; Cowden* v. *Commissioner*, 365 F. 2d 832 (C.A. 1, 1966), affirming a Memorandum Opinion of this Court.

Petitioners stress that their position is no different from the ordinary businessman who makes expenditures only on the likelihood that he will recover them in the course of business. We believe the situations are different. Here petitioners have made expenditures on behalf of a particular client, under a reimbursement agreement signed by the client, to pursue a claim held by the client—a claim of no use to any person other than the client. In reality, they are the client's expenditures.[3]

Petitioners introduced a private ruling issued to another taxpayer which they viewed as supporting their position. Wisely, they appear to have abandoned any reliance on this private ruling in their brief. See, e.g., *Bornstein* v. *United States*, 345 F. 2d 558 (Ct. Cl. 1965).

Alternatively, petitioners argue that they should be allowed to establish a reserve for bad debts arising from the advanced litigation costs. They contend that, if advanced costs are treated as loans for purposes of section 162(a), they should also be treated as loans for purposes of section 166(c). That argument has been previously rejected. *Burnett* v. *Commissioner*, 356 F. 2d 755, 759; *John J. Watts*, T. C. Memo. 1968-183. Section 1.166-1(c), Income Tax Regs., requires that there be "a valid and enforceable obligation to pay a fixed or determinable sum of money." The disbursements, at the time they are made, do not give rise to unconditional obligations to pay on the part of the clients. Under the contingent-fee contract the unconditional obligation to pay a fixed sum does not arise until the case is

---

[3] As for advancing fees, the Code of Professional Responsibility, adopted by the House of Delegates of the American Bar Association, provides: "A lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses."

closed. With respect to cases still pending at the end of a particular year, there was no obligation to repay and, therefore, no debt that could be ascertained to be worthless at that time. *Reginald G. Hearn, supra* at 674–675. Consequently, we hold that the law firm of Kane and Canelo is not entitled to bad debt deductions on deferred expenditures made in connection with cases that are still pending and not closed. When pending cases are closed without recovery of deferred advances, then deductions for unrecovered and lost advances are allowable as respondent has determined by offsets in his notices of deficiencies in these cases. Moreover, any determination of an addition to a reserve for bad debts is factual, and this record does not contain sufficient facts to support a claimed reserve of "25 percent of outstanding costs."

Petitioners' final assertion is that respondent erred in not allowing offsets for collections in 1960, 1961, and 1962 of advances made prior to 1960. Respondent did not allow the offsets for two reasons: (1) An undetermined portion of the advances were made by Kane prior to his association with Canelo and, unless Kane contributed these cases to the partnership, the recovery of such advances should not offset partnership income; and (2) petitioners have received a tax benefit by deducting the advances as expenses in years prior to 1960.

Petitioners correctly point out that under respondent's view of these transactions, if the advances are "loans" rather than expenses when paid, they are not income when recovered. Income is not offset by something from an earlier year; there is no income. After recovering the advances the petitioners have no more than they started with, so the recovery by itself does not create taxable income. Respondent's adjustments for 1961 and 1962 are in fact consistent with this approach and, under this view, whether part of the advances were made by Kane alone is irrelevant in determining partnership income.

Thus respondent falls back to the "tax benefit" rule and relies on it. That rule provides that amounts deducted from income in one year must be included in income if recovered in a later year. See *Dobson v. Commissioner*, 320 U.S. 489 (1943); *Estate of William H. Block*, 39 B.T.A. 338 (1939), affirmed sub nom. *Union Trust Co. v. Commissioner*, 111 F. 2d 60 (C.A. 7, 1940), certiorari denied 311 U.S. 658 (1940). However, the "tax benefit" rule applies only when the initial deduction was proper; it does not allow the Commissioner to increase a taxpayer's income by the amount of a deduction taken *improperly* in a year now closed by the statute of limitations. *Streckfus Steamers, Inc.*, 19 A.C. 1 (1952); cf. *Estate of William H. Block, supra*. We realize that petitioners herein have received a windfall through the improper deductions. But the statute of limitations requires eventual

repose. The "tax benefit" rule disturbs that repose only if respondent had no cause to question the initial deduction, that is, if the deduction was proper at the time it was taken. Here the deduction was improper, and respondent should have challenged it before the years prior to 1960 were closed by the statute of limitations. This situation is not covered by any of the carefully delineated adjustments permitted by sections 1311 through 1315 of the Code, and the *Dobson* case may not be used to justify the inconsistency of respondent in these circumstances. Accordingly, we hold that petitioners are entitled to adjustments for offsets of expenses paid prior to 1960 in the amounts set forth in our Findings of Fact.

2. *Claimed Loss on Sale and Removal of House from 560 Property.*—Section 1.165–3(a), Income Tax Regs., provides that no loss shall be allowable where real property is purchased with the intention of demolishing the building situated thereon. If so, the purchase price is allocable entirely to the land. Section 1.165–3(b) provides that a loss is allowed if the demolition occurs as a result of a plan formed subsequent to the acquisition of the building. Whether real property has been purchased with the intention of demolishing the building thereon or whether the demolition of the building occurs as the result of a plan formed subsequent to its acquisition is a factual question. The answer depends upon an examination of all the surrounding facts and circumstances. The question as to the taxpayer's intent is not answered by any inference that is drawn from any one fact or circumstance, but can be answered only by consideration of all relevant facts and circumstances and the reasonable inferences to be drawn therefrom. Sec. 1.165–3(c)(1), Income Tax Regs. Among the facts listed in the regulations as suggesting a plan formed subsequent to the acquisition are: (1) Substantial improvements of the building immediately after its acquisition; (2) prolonged use of the building for business purposes after its acquisition; (3) suitability of the building for investment purposes at the time of acquisition; and (4) substantial change in economic or business conditions after the date of acquisition.

Respondent's principal contention is that Kane intended to remove the house when he purchased the 560 property. Alternatively, he argues that the loss should be disallowed because Kane failed to substantiate his claimed allocation of the purchase price to the land and to the building. Petitioner Kane argues to the contrary on both points.

Kane's intention must be considered in the context of his personal situation. He was contemplating the termination of his partnership with Treadwell, with the prospect of an individual practice and with uncertainty as to the desirability of continuing in the same building with his former partner. He testified that he purchased the

560 property as an investment with the intention of using the existing structure for his law offices. He also testified that immediately after purchasing the property he was financially unable to remodel the building for his own use, and that, after agreeing to form a partnership with Canelo, he realized that the existing structure would not be large enough for their needs.

Kane's testimony is consistent with the other evidence. The purchase of the 560 property took place when Kane was planning to end his partnership with Treadwell, and the residence was large enough for a single practitioner. Kane had mortgaged both the 560 property and his own house to make the purchase. Although Kane paid more than the property was worth as a residence, and although he insisted on a month-to-month rental for flexibility, these facts are not at all inconsistent with an intent to use the residence for his own offices. While his testimony as to remodeling costs was somewhat vague, it is understandable that he would not have firm plans until his financial position improved.

We find no reason to reject Kane's testimony. While the short time between the purchase and application for waiver of setback lends some support to respondent's view of the events, we think it unlikely that an attorney practicing alone, with substantial debts and an uncertain practice, intended to undertake construction of an office building. Such a project would be much more attractive to a two-man partnership with a growing practice and its own growing space requirements. In these circumstances we hold that petitioner Kane did not acquire the 560 property intending to demolish the house situated thereon. Cf. *Andrew F. McBride, Jr.*, 50 T.C. 1 (1968). His intent was formed after the termination of his partnership with Treadwell, the passage of substantial time, the changed circumstance of an improved law practice, and the prospective partnership with Canelo.

We disagree with respondent's alternative position that *none* of the claimed loss of $8,723.45 on the sale of the 560 property should be allowed since Kane has not substantiated the cost basis which should be allocated to the building from the total purchase price ($20,336.55). Kane allocated 63 percent ($12,836.55) of the purchase price to the building. This was based upon tax assessor's appraisal. The Stanislaus Merced Savings & Loan Association, which had appraised the property for residential use, allocated 56 percent of the total appraised value to the building. Kane, with professional use in mind, paid twice the amount of the highest residential appraisal ($20,336.55 versus $10,100). Under the circumstances the allocations in evidence are of limited usefulness. However, we believe the commercial value of the building would not be less than its residential value, and that Kane has sub-

stantiated his allocation to the extent of the amount of $5,700 contained in the Stanislaus Merced appraisal dated August 10, 1960. Therefore, we have concluded, as reflected in our findings of fact, that the cost basis allocable to the 560 building was $5,700 of the purchase price. Kane is thus entitled to a loss in accordance with this determination.

3. *Claimed Loss and Depreciation Deductions on Sale and Removal of House from 548 Property.*—Again, with respect to the 548 property, respondent asserts that Kane intended to remove the house when he purchased it and, alternatively, that the claimed loss and depreciation deductions should be disallowed because of Kane's failure to substantiate his allocation of the purchase price between the building and the land.

The evidence as to the 548 property clearly supports the petitioner Kane. He expended $2,500 for plans which assumed the continued existence of the house. That fact alone should negate any initial intent to destroy the house. Other evidence shows that Kane did not choose to proceed under the approved plan because its unsatisfactory parking arrangement made the house unsuitable for rental. Then the revised parking ordinance eliminated the possibility of reducing the planned parking space. At that point Kane was virtually forced to give up either his new office building or the 548 structure. We think he did not purchase the 548 property intending to destroy or remove the existing residence. His intent was formed more than a year later when his plans to keep the residence and use the back yard for parking were thwarted by the unacceptable conditions of the planning commission.

The 548 property, land and building, was purchased on August 15, 1960, for a total price of $29,393.70. Kane allocated $18,456.39 of the total price as the cost basis of the building. We note again that the appraisals in evidence assumed a continued residential use for the whole 548 property, although Kane intended to use part of the land for parking. It appears that the land value to Kane is underestimated and that his percentage allocation to the building is inflated. The appraisal of the Merced Mariposa Savings & Loan Association assigns a $15,472 value to the house and the appraisal of the Stanislaus Merced Savings & Loan Association assigns it a value of $10,250. The value of the insurance coverage was $15,000. Under the circumstances we think an average ($12,861) of the Mariposa and Stanislaus appraisals would indicate the proper cost basis of the building. Our findings of fact so reflect. Accordingly, we hold that Kane is entitled to a loss on the sale of the 548 property, as well as depreciation deductions, based upon a cost basis of $12,861 for the building.

4. *Claimed Depreciation Deductions on House on 549 Property.*— This disputed factual issue relating to the disallowed depreciations on

the 549 property concerns the amount of the purchase price which should be allocated to the building situated thereon. Canelo allocated $12,649.14, or 50 percent, of the purchase price to the building and claimed as depreciation deductions of $421.63 and $1,222.75 in 1961 and 1962, respectively. Respondent asserts that the proper cost basis for the building is $10,850 resulting in disallowed depreciation of $59.97 for 1961 and $173.92 for 1962.

Canelo's allocation seems to be some sort of rough average of various appraisals available, but respondent insists that the Fitzgerald appraisal is entitled to special weight. It appears to us that Fitzgerald's three-sevenths formula is casually borrowed from the 1961 municipal assessment valuations. The assessment valuations are very round figures and fractions of true values. It is also noted that the assessment valuations show land increasing in valuation while the building decreased. This means that the later appraisals would tend to underestimate the proportionate value of the building in 1961. Consequently, there is no reason to assign particular weight to the Fitzgerald appraisal, nor to discount the allocations of the savings and loan associations as being inflated by changing circumstances. An average seems in order. Since Canelo's allocation is less than a straight average, it is approved. Therefore, we sustain Canelo on this issue.

To reflect the conceded adjustments and the conclusions reached herein on the disputed issues,

*Decisions will be entered under Rule 50*