MARK H. RICHMOND and RICHALYN L. RICHMOND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Richmond v. Commissioner
Docket No. 31339-84.
United States Tax Court
T.C. Memo 1988-509; 1988 Tax Ct. Memo LEXIS 541; 56 T.C.M. (CCH) 545; T.C.M. (RIA) 88509; October 24, 1988. James B. Persons, for the petitioners. Linda J. Wise, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELD, Judge: Respondent determined a deficiency of $ 10,266.14 in petitioners' 1980 income tax. After concessions, including respondent's admission at trial that petitioners are entitled to a loss deduction with regard to their well and water system in the amount of $ 1,546, the only issue remaining for decision is what amount if any are petitioners entitled to deduct under section 165 [1] for demolition losses. FINDINGS OF FACT Some of the facts have been stipulated by the parties *542 and are so found. Their stipulations and the exhibits attached thereto are incorporated herein by reference. Petitioners, Mark H. Richmond (who is hereinafter referred to as petitioner in the singular) and Richalyn L. Richmond, husband and wife, resided in Biloxi, Mississippi at the time their petition was filed and when they filed a joint income tax return for 1980 with the Internal Revenue Service Center in Atlanta. Prior to March of 1980, petitioner who was then employed as a traveling salesman began to investigate the possibility of buying a combination motel and apartment business. He looked at two such businesses in the local area, the Balmoral Motel and the Aldridge House, both of which had motel rooms as well as apartment-type rental units. He made an offer on one of these businesses but it was rejected. Himbert Sinopoli, a local real estate salesman, then showed him the property known as Cabana Gardens Motel. It consisted of 2.94 acres of land which was then improved with a two-story motel building with 16 rooms and eight separate cottages containing 11 apartment units together with a swimming pool, well and water system, sewage system, furniture, fixtures and *543 equipment. The property is located in the western part of Biloxi. It fronts about 135 feet on the north side of a service road (Beach Boulevard) which runs parallel to U.S. Highway 90. Immediately across the service road and Highway 90 to the south of the property is a small public beach on the Gulf of Mexico which previously constituted a part of the subject property but was specifically excluded from the conveyance to petitioners. From its 135 feet of frontage on the north side of Beach Boulevard the property runs generally northward between approximately parallel lines for about 921 feet on the west and about 908 feet on the east. The motel building is on the front of the property and in 1980 the eight cottages containing the 11 apartment units were generally to the rear of the motel building. The motel building had been built in 1960 and the other buildings in about 1940. In March 1980 when first inspected by petitioner the apartment units were in various stages of disrepair. A triplex containing Units 1A, 1B and 1C was in poor condition with foundation problems and holes in its walls. Two of these apartments were available for rent but the third was used solely for *544 storage. Unit 2, located in a separate cottage, was in fair condition and was either rented or available for rent at all relevant times. A duplex containing Units 3 and 4 was in fair condition except for some minor fire damage to an interior wall and was available for rent. Unit 5, also located in a separate cottage, was not in good condition but was rented. At all times relevant to this case, there was no Apartment Unit 6. Unit 7, in a separate building near the motel and which had been the personal residence of a former owner, had some foundation problems but was otherwise in fairly good condition and was available for rent. A separate building containing Unit 8 was in fair condition and rented. A separate building, containing Unit 9, was in poor condition but the unit was rented, but a separate building in which Unit 10 was located was in very poor condition and the unit was unusuable. At the time petitioner first saw Cabana Gardens, in March 1980, it was owned by R. D. Harris of Psasdena, Texas. Mr. Harris had bought the property in November of 1979 and had spent about a month personally renovating and refurbishing the motel building with paint, wallpaper, carpets, drapes, *545 television sets and some work in the bathrooms and on the roof. He had made minimal repairs to Apartment Units 1, 5 and 9. He had not made any repairs to the other apartment units. In March 1980 Mr. Sinopoli, the real estate agent, "walked through" the property with petitioner. They did not inspect every motel room but they looked briefly at every apartment unit. All apartment units were furnished with beds, tables, chairs, sofas, television sets, air conditioning units, refrigerators, stoves, linens, dishes, pots, pans and other cooking utensils. A thorough inspection of the occupied apartments was impractical and petitioner concluded it was not necessary to hire an engineer to assess needed repairs to the apartment buildings because he had grown up in the construction business and had known carpenters and plumbers all of his life. However, he had no experience in the electrical field. Petitioner estimated that repairs to the apartment units would cost about $ 50,000. On March 21, 1980, petitioners contracted to purchase Cabana Gardens from Mr. & Mrs. Harris for $ 200,000 with $ 50,000 to be paid at the closing and the balance to be represented by a note payable to the *546 sellers. Petitioners also paid $ 3,250 in commissions and attorney fees for a total basis in the property of $ 203,250. Petitioners were required by the sellers to maintain at least $ 100,000 in fire and extended coverage insurance on the improvements to the property. Petitioners placed all of the insurance on the motel building and carried no insurance on the apartment buildings because they felt that the major threat to the improvements was from storms coming in from the Gulf and that the motel building being on the front of the property would bear the brunt of any such storms. They would not have carried any insurance if the sellers had not required it. The apartment units were a major consideration in petitioners' decision to buy the property because petitioners believed that the apartments would provide a steady cash flow which was not dependent upon overnight motel guests. At the time they bought the property, petitioners intended to repair all of the apartment units to a rentable condition. The purchase by petitioners of the property on the aforesaid terms was closed on April 2, 1980 and on May 13, 1980 they filed an application with the Building Inspection Department *547 of the City of Biloxi for a Certificate of Occupancy which would permit them to use the motel and apartment buildings. Shortly thereafter, James H. Cook, the city's building inspector, together with its electrical inspector and plumbing inspector examined the entire property and in a report dated May 15, 1980 found that the electrical wiring in all of the apartment units did not comply with the city code. The building inspector's report concluded that Apartment Units 4, 5, 8, 9 and 10 should be demolished and that Units 1A, 1B, 1C and 7 should be completely renovated. Although their written report contained some unexplained contradictions such as the inclusion of Unit 4 in both the units to be demolished as well as the units to be completely renovated and the failure to mention Unit 3 although it was one-half of a duplex which also contained Unit 4, the city inspectors orally informed petitioners that they would not be permitted to use any part of the property including the motel building unless all of the apartment units were either brought into compliance with the city code or demolished. Upon receipt of this ultimatum, petitioners undertook to renovate units 1A, 1B, 1C and 7 *548 but these repairs, especially the re-wiring, unexpectedly totaled about $ 30,000. Consequently by the end of May 1980, petitioners had decided that they could not afford to renovate all of the apartments because their original estimate for all repairs was about $ 50,000. Therefore they removed the tenants from all units except 1A, 1B, 1C, 7 and 9 and disconnected their utilities. Renovations to units 1A, 1B, 1C and 7 were completed in June of 1980 and at the behest of Mr. Harris those units were insured. Upon the completion of the renovations with respect to units 1A, 1B, 1C and 7, petitioners demolished units 3, 4, 5, 8 and 10. At about the same time, petitioners partially gutted unit 9 and abandoned it. The furniture and fixtures from the demolished and abandoned units were given away or discarded. Some utensils such as pots, pans, and dishes were kept for use in the motel or in the remaining apartments. Apartment Unit 2 was not demolished until 1981 and is not at issue in this case. At about the end of May 1980, the well which supplied the water for the motel and the apartments went dry and petitioners were forced to abandon it and hook to the city water system. After *549 first considering and rejecting a plan to construct a park for recreational vehicles petitioners in 1981 built an apartment building containing eight units on the land where the demolished units had been located. Upon its acquisition by petitioners, their accountant allocated the total basis of $ 203,250 in the Cabana Gardens property to its various components by reference to a 1973 appraisal which had been made of the property for a previous owner by Harry C. Crouch a local appraiser with 30 years experience. Using a comparable cost approach, Mr. Crouch determined a total value in 1973 for the property of $ 320,475 which he allocated as follows: Motel building (16 rooms)
$ 80,000
Linen storage room (rear of motel)
300
Apartment Units:
7
8,500
1A, 1B & 1C
10,000
2
3,500
9
3,500
5
5,000
3 and 4
7,000
8
3,500
10
3,500
Swimming pool
8,500
Well and water system
2,500
Furniture, fixtures and equipment (30 units)
[2] 30,000
Total cost of improvements
$ 165,800
Land value
$ 154,675
Total value of land and improvements
$ 320,475
*550 Petitioners' accountant calculated the percentage of total value represented by each asset in the 1973 Crouch appraisal and applied the same percentage to petitioners' total basis to determine petitioners' basis in each asset. Using this approach, the accountant calculated that the basis allocable to each of the assets in 1980 was as follows: Motel building
$ 50,752
Linen storage room
203
Apartment Units:
7
5,386
1A, 1B & 1C
6,341
2
2,215
9
2,215
5
3,171
3 and 4
4,451
8
2,215
10
2,215
Swimming pool
5,387
Well and water system
1,586
Furniture, fixtures and equipment
19,025
Total cost of improvements
$ 105,162
Land
$  98,088
Total value of land and improvements
$ 203,250
OPINION Under section 165(a) a taxpayer is entitled to deduct a loss not compensated for by insurance or otherwise in the year it is sustained. A loss stemming from the voluntary demolition of a building is deductible if the intent to demolish was formed by the taxpayer after acquisition of the property. Section 1.165-3(b), Income Tax Regs. The purchaser's intent at the time of acquisition is a question of fact. *551 Canelo v. Commissioner,53 T.C. 217 (1969), affirmed per curiam on another issue 447 F.2d 484 (9th Cir. 1971). The burden of proof is on the taxpayer to show by a preponderance of the evidence that the plan to demolish the building was formed subsequent to his acquisition of the property. See Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). A series of objective factors to be considered when determining the taxpayer's subjective intent at the date of acquisition is set forth in section 1.165-3(c), Income Tax Regs., the relevant portion of which is as follows: Section 1.165-3(c) Evidence of intention. (1) * * * The answer to the question does not depend solely upon the statements of the taxpayer at the time he acquired the property or demolished the buildings, but such statements, if made, are relevant and will be considered. [Emphasis added]. * * * The question as to the taxpayer's intention is not answered by any inference that is drawn from any one fact or circumstance but can be answered only by a consideration of all relevant facts and circumstances and the reasonable inferences to be drawn therefrom. (2) An *552 intention at the time of acquisition to demolish may be suggested by: [emphasis added] (i) A short delay between the date of acquisition and the date of demolition; (ii) Evidence of prohibitive remodeling costs determined at the time of acquisition; (iii) Existence of municipal regulations at the time of acquisition which would prohibit the continued use of the buildings for profit purposes; (iv) Unsuitability of the buildings for the taxpayer's trade or business at the time of acquisition; or (v) Inability at the time of acquisition to realize a reasonable income from the buildings. (3) The fact that the demolition occurred pursuant to a plan formed subsequent to the acquisition of the property may be suggested by: [emphasis added] (i) Substantial improvement of the buildings immediately after their acquisition; (ii) Prolonged use of the buildings for business purposes after their acquisition; (iii) Suitability of the buildings for investment purposes at the time of acquisition; (iv) Substantial change in economic or business conditions after the date of acquisition; (v) Loss of useful value occurring after the date of acquisition; (vi) *553 Substantial damage to the buildings occurring after their acquisition; (vii) Discovery of latent structural defects in the buildings after their acquisition; (viii) Decline in the taxpayer's business after the date of acquisition; (ix) Condemnation of the property by municipal authorities after the date of acquisition; or (x) Inability after acquisition to obtain building material necessary for the improvement of the property. In this case, respondent first attacks the year in which the alleged demolition occurred by contending that the only evidence in the record that any of the buildings were demolished in 1980 is the testimony of petitioner which testimony according to respondent is not credible. We disagree, however, because from the record as a whole and from our observation of petitioner at trial we not only find no reason to doubt his truthfulness but also find that his testimony is largely corroborated by the testimony of other witnesses. For instance, the testimony of Dianne Richmond (petitioner's sister-in-law and the manager of Cabana Gardens), Himbert Sinopoli, the real estate agent who handled the sale of the property, and R. D. Harris, the former owner, tended *554 to corroborate petitioner's testimony that units 3, 4, 5, 8 and 10 were completely demolished in 1980 and that unit 9 was partially gutted and abandoned by petitioner in the same year. Respondent next argues that under section 1.165-3(c)(2) of the regulations the existence of an intention by petitioners to demolish the apartment units is apparent from the short period of time between the acquisition of the property and the demolition or abandonment of the apartments, the prohibitive costs of renovating the apartments which existed at the time of acquisition, and the existence at acquisition of the municipal regulations which prohibited the use of the apartments. This attempt by respondent to apply only the objective factors listed in section 1.165-3(c)(2) to this case represents a selective view of the facts and circumstances before us since section 1.165-3(c)(3) contain other factors which may be considered to suggest the adoption of a demolition plan after an acquisition. Such factors, which are present here, include substantial improvements or attempts to improve the buildings by petitioners after their acquisition and before their demolition, discovery by petitioners of latent *555 structural defects in the buildings after their acquisition, and the virtual condemnation of the buildings after their acquisition by the municipal authorities. Furthermore, petitioner's testimony regarding his intention at acquisition to repair and renovate rather than demolish the apartments is also corroborated at least to some extent by the testimony of Dianne Richmond, Mr. Sinopoli and Mr. Harris. We are unable to accept respondent's further argument that the testimony of Mr. Harris the former owner as well as the testimony and findings of Mr. Cook the city building inspector clearly establishes that there were prohibitive renovating costs needed by the apartment units at the time of their acquisition. First, on cross examination Mr. Harris admitted that the fire damage to the duplex containing units 3 and 4 was limited to an interior wall which according to him could easily be repaired and both units returned to a rentable condition. In fact the general tenor of Mr. Harris' testimony was not that repairs to the apartments were prohibitively expensive but that in the short time he owned the property he had been able to do very little repair work on the apartments. Secondly, *556 the inspection by the building inspector was not made until after the acquisition and the record contains no evidence which tends to show that petitioner was aware of the inspector's findings at or prior to the acquisition. Respondent also claims that the condition of the apartment units at the date of their acquisition by petitioners was so bad that the units were unsuitable for rental and that petitioners should have known that local fire and safety regulations would prohibit the continued use of the property as public accommodations without substantial improvements. As set forth in our findings, petitioner inspected all of the apartment units prior to purchase of the property and admittedly knew that some repairs were needed with respect to all of the apartment units; but with the exception of unit 10 and one of the units in the triplex, all units were either rented or available for rent at that time. However, from the record before us we are unable to find that petitioner knew that he would be unable to use any part of the property including the motel without making extensive renovations including rewiring all of the rental units until he was so advised by the building inspector *557 on May 15, 1980 approximately six weeks after the purchase. Finally respondent contends petitioner knew or should have known that the apartments were incapable of realizing a reasonable income at the time of the acquisition because he had access to the 1973 Crouch appraisal in which it was concluded that the apartments did "not contribute too much as a value to the entire property." However, while it appears from his appraisal report that Mr. Crouch was of the opinion in 1973 that the highest and best use of the property would be as a high density development with a complete abandonment of the small motel and apartment business; in final analysis, Mr. Crouch concluded that a living could be made from operating the small motel and apartments. In any event his offhand and outdated conclusion that the apartments did not contribute to the total value of the property is of limited relevance here and is contradicted by the testimony of both petitioner and Mr. Harris that they would not have bought the property in 1979 or 1980 without the apartments. They both considered the apartments to be a stabilizing factor because of their capacity to provide a steady income as contrasted to the *558 income from the motel which would vary with the season and changes in the general economy. Petitioners' belief that the apartments added value to the property is further illustrated by the fact that in 1981 they built a new building containing eight apartment units on the same site. Moreover respondent offered no evidence from which we can determine whether or not the apartments were profitable in 1980. While a more prudent investor, especially one with experience in the operation of a similar business, might have made a further investigation including contacts with the building inspector or even employed engineers to inspect the property, petitioner chose to rely on his own limited experience in the building trades and his willingness to do most of the repair work himself in determining whether as a practical matter the apartments could be renovated. By doing so he may have demonstrated that he was not a well-informed buyer, but we are satisfied that his ignorance was not willful or feigned. In view of all of the foregoing we conclude that petitioners did not acquire Cabana Gardens with the intention of demolishing any part of the apartment units. Instead they acquired the *559 property with the intention of making whatever repairs and renovations were necessary to the apartment units in order to continue the operation of a motel-apartment business. Upon learning that no part of the property including the motel building could be used unless all of the apartments were renovated to the point that they complied with the local building code and that such renovations could not be reasonably made they abandoned or demolished apartment units 3, 4, 5, 8, 9 and 10 in 1980. Respondent further contends that even if we find as we have that petitioners demolished some of the apartment units in 1980 and that such demolition occurred pursuant to a plan formed after the property was acquired petitioners are not entitled to a loss deduction because they have failed to establish their basis in the demolished apartment units. With respect to this point respondent relies entirely upon the expert testimony and report of William K. Chance, one of respondent's Engineer Revenue Agents. However, Mr. Chance did not inspect the property until December of 1987, more than seven years after the apartments were demolished. Nevertheless he concluded that since the buildings were built *560 in 1940, they had no useful life remaining in 1980 and hence no value when they were purchased or demolished. While we have considered Mr. Chance's testimony and report we are unable under the circumstances to attribute any weight to them especially in view of the testimony by petitioner and Mr. Harris, the former owner and a witness for respondent, that the apartments were a major consideration in their valuation of the property. In fact, Mr. Harris placed an average value of $ 5,000 on each apartment. Moreover, Mr. Crouch concluded in his 1973 appraisal that the apartments had a remaining life of about 20 years of which 13 years remained in 1980 when petitioners demolished or abandoned units 3, 4, 5, 8, 9 and 10. We have set forth in our findings the manner in which petitioners' accountant allocated their total basis in the property of $ 203,250 to the various components by reference to Mr. Crouch's 1973 appraisal. From the record as a whole we conclude that petitioners' allocation is reasonable and that in 1980 petitioners are entitled to a demolition deduction in the following amounts for apartment units 3, 4, 5, 8, 9 and 10 and the furniture, fixtures and equipment located *561 in such units: Units 3 and 4
$  4,451
Unit 5
3,171
Unit 8
2,215
Unit 9
2,215
Unit 10
2,215
Furniture, fixtures & equipment
3,805
Total
$ 18,072
To reflect the foregoing, as well as concessions Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.↩
2. Mr. Crouch arrived at this figure by valuing the furniture, fixtures and equipment at $ 1,000 per unit for 30 units, 16 motel rooms and 14 apartment units. The record contains no explanation for the discrepancy in the apartment units found by Mr. Crouch in 1973 (14) and the number of apartment units purchased by petitioners in 1980 (11). However, the discrepancy is relatively insignificant for our purposes.↩