T.C. Memo. 2000-232


UNITED STATES TAX COURT


RALPH J. AND MARY H. MUEGGE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15169-98.                    Filed August 2, 2000.


Ralph J. Muegge and Mary H. Muegge, pro se.

<u>Angela J. Kennedy</u> and <u>Stewart Todd Hittinger</u>, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined a $26,282 deficiency
in petitioners' Federal income tax for 1993.

Petitioners received $182,500 in satisfaction of
petitioner's claim against the Estate of Robert J. Stern (the
Stern estate), and reported one-half of that amount as income on

their personal tax return.  After concessions,[1] the sole issue for decision is whether the entire amount that petitioner Mary H. Muegge received was taxable income for services she performed for Robert J. Stern, as respondent contends; or whether one-half of that amount was a nontaxable reimbursement Robert J. Stern promised to petitioners, as petitioners contend.  We hold that it is a nontaxable reimbursement.

Section references are to the Internal Revenue Code in effect for the taxable year in issue, unless otherwise indicated. Rule references are to the Tax Court Rules of Practice and Procedure.  References to petitioner are to Mary H. Muegge.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners lived in Carmel, Indiana, when they filed the petition.

A.   Petitioners' Support of Mr. Stern

1.   Mr. Stern's Sister

Before 1984, petitioner was employed as a surgical technician in Columbus, Ohio.  In the course of her employment, petitioner met and became close friends with a patient, Ruth Stern (Ms. Stern), who had cancer.  Ms. Stern told petitioner of her concern for her brother, Robert J. Stern (Mr. Stern).  While

---

[1]  In the answer, respondent contended that the amounts petitioner Mary H. Muegge received for services that she provided Mr. Stern were subject to self-employment tax under sec. 1401. Petitioners concede this issue on brief.

Ms. Stern was dying, petitioner promised Ms. Stern that she would check on Mr. Stern. Shortly after Ms. Stern died, petitioner began to visit Mr. Stern from time to time to check on his well-being. Petitioner retired in 1984 and moved to Indianapolis, Indiana.

2. Mr. Stern's Accident and Colon Cancer

In 1987, Mr. Stern was severely injured in an accident. Mr. Stern came to stay with petitioners in Indianapolis while he recuperated. Mr. Stern appeared to have recovered after 3 or 4 months, and he returned to his apartment in the basement of a warehouse in Columbus. Petitioner visited him a few days later and found him lying on a bloody mattress.

Petitioner cleaned Mr. Stern and took him to a medical clinic to be examined. Mr. Stern was diagnosed with colon cancer, and the doctor recommended a colostomy. Not satisfied with that recommendation, petitioner took Mr. Stern to a surgeon she knew in Columbus for a second opinion. After examining Mr. Stern and the x-rays, the surgeon performed a colon resection. Petitioner stayed in Columbus for 10 days while Mr. Stern was in the hospital for the operation. Mr. Stern asked if he could stay with petitioners, and petitioners agreed that he could live in their home until he recovered.

3.   Petitioners' Care for Mr. Stern From 1987 to 1992

Mr. Stern lived with petitioners in Indianapolis for 5 years, from 1987 until he died in 1992.  Mr. Stern paid no rent during the time that he lived in petitioners' home.  Petitioners moved Mr. Stern into their guest bedroom, which had a radio, television, and telephone.  Petitioners also provided Mr. Stern a home office with a desk, typewriter, writing materials, and a locking fireproof file cabinet.  Mr. Stern needed the office because he had numerous investments and bank accounts.

Mr. Stern had full use of petitioners' house.  For example, in addition to using the furnished bedroom and office, Mr. Stern kept boxes containing his business records in one bay of petitioners' two-car garage and kept his automobile in the other bay.

Petitioner bought clothing for Mr. Stern, including shoes, socks, hats, gloves, a suit, two dress shirts, two ties, a topcoat, sweaters, insulated pants and shirts, a warm-up suit, pajamas, a robe, slippers, and underwear.

During the 5 years that Mr. Stern lived in petitioners' home, petitioner bought all the personal items he required, including shaving gel, razor and blades, aftershave lotion, denture cleaning tablets, denture liners, nail clippers, deodorant, shampoo, hair dressing, brushes, ear wax remover, tissues, first aid items, foot powder, vitamins, milk of

magnesia, enemas, adult diapers, and disposable bags for the diapers. Petitioner also bought Mr. Stern a hearing aid, a watch, and new eye glasses, and paid to have his false teeth and eye glasses repaired. Petitioner took Mr. Stern to the barber for a haircut twice each month.

Petitioners also spent time and money to provide for Mr. Stern's other interests. For example, petitioners paid for Mr. Stern to attend special automobile driving lessons for elderly persons. Mr. Stern liked to fish, so petitioner bought fishing tackle for him and regularly took him fishing. Petitioner also took Mr. Stern to auctions and on other outings.

Mr. Stern read magazines and several newspapers every day. He often wrote articles that were published in the newspapers. When Mr. Stern's articles were published, petitioners bought several copies of the newspaper because Mr. Stern wanted extra copies of originals, not photocopies. Petitioners paid for Mr. Stern's magazines and newspapers, the postage to send his articles to the newspapers, and extra copies of the newspapers.

Mr. Stern met the mail carrier daily and kept the mail, including mail addressed to petitioners. As a result, petitioners sometimes waited several days to see their mail.

Mr. Stern twice set his bed on fire, and each time petitioners replaced it at their own expense.

Mr. Stern liked to listen to the radio, often all day and

night.  Mr. Stern often felt cold, and so he slept with two electric blankets in addition to regular blankets, and he kept the house temperature at 78 or 80 degrees.  Petitioners accommodated Mr. Stern's preferences, which caused their electric bill to triple.  Mr. Stern did not contribute any payment for the utilities.

Petitioner changed her grocery shopping practices so she could meet Mr. Stern's special dietary requirements.  Mr. Stern usually ate at least four times a day.  Mr. Stern requested certain foods, and petitioner learned to prepare the foods the way Mr. Stern preferred, including some of Mr. Stern's mother's recipes.  Mr. Stern also ordered take-out food from a restaurant several times each week, for which petitioners paid.  Petitioners did not require the same diet as Mr. Stern, but they ate the same food that Mr. Stern did to save money and to simplify meal preparation.

After the colon operation, Mr. Stern was required to wear adult diapers, especially at night.  Petitioner fitted Mr. Stern's mattress with a plastic cover and was required to regularly wash the bed linens.  Petitioners bought the diapers, bed linens, and extra electric blankets for Mr. Stern, and paid to have the blankets dry cleaned frequently.

During the first 3 years after the operation, Mr. Stern went to the hospital in Columbus every 3 months for a medical checkup.

Later, he went every 6 months.  Petitioner drove him to Columbus the day before each appointment, stayed overnight in a hotel, and drove him to Indianapolis the following day.  Mr. Stern's medical insurance paid for the checkups, and petitioner paid for everything else.

In addition to colon cancer and a heart ailment, Mr. Stern suffered from a painful condition termed "potato feet".  Mr. Stern's feet were frozen during the Battle of the Bulge in World War II.  This caused lasting, painful damage and turned his feet almost black.  At night, when the pain prevented him from sleeping, Mr. Stern woke petitioner so she could help him put a whirlpool device into a bathtub and soak his feet.  After the whirlpool treatment, petitioner dried Mr. Stern's feet and then massaged them with either cocoa butter or a special balm to alleviate his pain so he could sleep.  Because of this ailment, Mr. Stern consumed massive doses of penicillin.  Petitioner paid for the penicillin.

Petitioner tried to find relatives of Mr. Stern with whom he could live.  However, Mr. Stern had no living relatives.  On three occasions, petitioner took Mr. Stern to a nursing facility in Indianapolis; however, Mr. Stern refused to leave petitioners' home to live anywhere else.

4. Mr. Stern's Promise To Pay Petitioners' Expenses on His Behalf

On April 2, 1990, Mr. Stern promised to compensate petitioner for her care for him and to repay petitioners for their expenses on his behalf. Mr. Stern had substantial financial means when he promised to pay petitioner. Petitioners expected Mr. Stern to pay for the care that petitioner provided him.

B. Mr. Stern's Death and Estate

Mr. Stern died testate in 1992. His estate was worth about $1 million. He left $1,000 to charity, and the rest to petitioner.

Petitioner filed a claim against Mr. Stern's estate for $182,500. The amount of her claim was based on estimates of her per-day expenses and the value of the services that petitioner provided to Mr. Stern, multiplied by the number of days that Mr. Stern lived with petitioners. On January 20, 1993, Judge Charles J. Deiter (Judge Deiter), Marion Superior Court, Probate Division, approved the claim, and ordered that the estate pay her $182,500, "of which one-half * * * [was] reimbursement for living expenses and the other half for personal care."

On its Federal estate tax return, the Stern estate deducted the $182,500 it paid to satisfy petitioner's claim. The Commissioner determined that the claim was not deductible under section 2053, and that petitioner's claim against the estate was

not "contracted bona fide and for an adequate and full consideration in money or money's worth." The Stern estate paid the deficiency and sued for a refund in the U.S. District Court, Southern District of Indiana. In September 1997, the District Court held that petitioner's claim against the estate was deductible.

## C. Petitioners' 1993 Return

On their 1993 return, petitioners reported one-half ($91,250) of the amount petitioner received in satisfaction of her claim as income from wages, salaries, tips, etc. Petitioners did not report the other one-half of the award ($91,250) as income or deduct any of their expenses of caring for Mr. Stern.

OPINION

## A. Whether Certain Payments From the Stern Estate Were Nontaxable Reimbursements of Petitioners' Expenses

Respondent contends that the $182,500 that petitioners received from Mr. Stern's estate in 1993 was compensation for their services to Mr. Stern, and that petitioners may not deduct their expenses on behalf of Mr. Stern because petitioners paid those expenses in prior taxable years.[2] Respondent also contends that the expenses were not deductible under section 162 and were personal expenses under sections 262 and 263.

---

[2] Respondent concedes that petitioners may deduct $17,138 of their expenses in 1993. Consequently, respondent contends that petitioners underreported their 1993 income by $74,112 ($91,250 minus $17,138).

Petitioners reported $91,250 of the $182,500 as income and do not contend that they may deduct any of their expenses of caring for Mr. Stern during the 5 years that he lived with them. Instead, petitioners contend in the petition that $91,250 is a reimbursement of the expenses that they paid while caring for Mr. Stern (reimbursement contention). We agree with petitioners.

The parties stipulated that Mr. Stern promised to pay petitioners for their expenditures on his behalf, and that petitioners expected repayment.[3] Expenditures made with the expectation of reimbursement are in the nature of loans or advances, even without formal indebtedness. See Burnett v. Commissioner, 356 F.2d 755, 759 (5th Cir. 1966) (attorney's payments of his client's expenses were virtually certain to be repaid, thus not deductible as business expenses), affg. and remanding 42 T.C. 9 (1964); Universal Oil Prods. Co. v. Campbell, 181 F.2d 451, 474 (7th Cir. 1950); Glendinning, McLeish & Co. v. Commissioner, 61 F.2d 950, 952 (2d Cir. 1932), affg. 24 B.T.A. 518 (1931); Herrick v. Commissioner, 63 T.C. 562, 566 (1975) (advances made with expectation of reimbursement even though there was no explicit promise or agreement to that effect); Canelo v. Commissioner, 53 T.C. 217, 224-225 (1969), affd. per curiam 447 F.2d 484 (9th Cir. 1971); Patchen v. Commissioner, 27

---

[3] These stipulations are consistent with the findings of fact in the proceedings of both the Marion Superior Court, Probate Division, and the Indiana District Court.

T.C. 592, 600 (1956), affd. in part and revd. in part on other grounds 258 F.2d 544 (5th Cir. 1958). A reimbursement is in the nature of a repayment of borrowed funds, which is not taxable. See Gulf Life Ins. Co. v. United States, 35 Fed. Cl. 12, 19 (1996), affd. 118 F.3d 1563 (Fed. Cir. 1997).

B.    Whether Petitioners Proved That Their Expenses Totaled $91,250

Respondent contends that petitioners have not substantiated the amount of their expenditures on behalf of Mr. Stern. We disagree. See Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930), affg. in part and remanding 11 B.T.A. 743 (1928). Mr. Stern paid for nothing except his doctor bills during the 5 years that he lived with petitioners. Petitioner paid for everything else that Mr. Stern needed or wanted, including hotels, transportation, food, clothing, personal items, medicines and balms, hearing aid, eyeglasses, denture and eyeglass repair, laundry, dry cleaning, office supplies, sundries, periodicals, and many other expenses. Petitioner testified credibly that petitioners spent more than $91,250 on behalf of Mr. Stern. We conclude that petitioners received $91,250 in nontaxable reimbursement in 1993.[4]

---

[4] Petitioners point out that their position here was previously accepted by State and Federal courts. The Marion Superior Court, Probate Division, found that petitioner was entitled to $91,250 as reimbursement for expenses petitioner incurred on Mr. Stern's behalf. Judge Daniel Tinder of the U.S. District Court for the Southern District of Indiana said in

(continued...)

To reflect concessions and the foregoing,

Decision will be entered

under Rule 155.

---

[4](...continued)
Estate of Stern v. IRS, 81 AFTR 2d 98-501, 98-1 USTC par. 60,299, at 84,372 (S.D. Ind. 1998):

> It should be noted that Judge Deiter is a greatly respected and long experienced probate judge.  This court can presume that Judge Deiter was well familiar with the reasonable costs of assisted living care in the central Indiana area at the time of the hearing and, thus, he implicitly found the value of Mrs. Muegge's claim to be appropriate.  This court can also presume that Judge Dieter was well aware of the impact of allowing such a claim on the taxable value of the estate.  Such issues are involved in probated estates on a daily basis.

However, in light of our conclusion, we need not decide petitioners' contention that collateral estoppel or res judicata applies.