MARY JANE RAY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ray v. Commissioner
Docket No. 36379-85
United States Tax Court
T.C. Memo 1989-628; 1989 Tax Ct. Memo LEXIS 628; 58 T.C.M. (CCH) 744; T.C.M. (RIA) 89628; November 27, 1989
W. L. Nichol IV, for the petitioner. Howard P. Levine, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the taxable years 1982 and 1983 in the amounts of $ 12,454.45 and $ 8,838.71, respectively. [1]
*630 The issue is whether the expenses claimed by petitioner in connection with a house inherited from her mother, which has never been offered for rent or for sale, are ordinary and necessary expenses paid for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income within the meaning of section 212(1) or (2). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner, at the time of filing her petition and for many years prior thereto, maintained her residence at 79 Lombardy Road, Memphis, Tennessee. She filed her 1982 and 1983 Federal income tax returns with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner's home on Lombardy Road is located a couple of blocks from her mother's home. Petitioner, an only child, *631 was very close to her mother. Her mother, Jane Barham Peoples, owned a home at 360 Goodwyn Street, Memphis, Tennessee, where she had lived from 1952 until her death on September 28, 1977. According to the terms of her Last Will and Testament, Jane Barham Peoples devised and bequeathed to her daughter, Mary Jane Peoples Ray, the property located at 360 Goodwyn Street, Memphis, Tennessee, the furniture and furnishings in the house, a 1965 Cadillac automobile, stocks and bonds, and certain rental properties. Petitioner received a total inheritance from her mother of $ 961,324.39. At the time of her mother's death, the fair market value of the house and lot at 360 Goodwyn Street was appraised at $ 150,000. The furniture and furnishings in the house were appraised at $ 18,109. Prior to her mother's death, petitioner had had a little experience owning and selling real estate properties. For example, she and her late husband purchased and later sold a lot in Chickasaw Gardens. She and her husband also sold a duplex that her parents had given to them with the stipulation that they sell it. Also petitioner inherited a small commercial rental building in downtown Memphis, Tennessee, *632 and a half interest in a plantation in Louisiana. Petitioner apparently was involved to some extent in the sale of two buildings in downtown Memphis that her father, who died in 1966, had owned. At the time of the trial she was still renting the one small commercial building in the downtown area. Shortly after her mother's death, petitioner received inquiries about the possible sale of her mother's residence. Petitioner has never offered the house for sale or for rent. The 360 Goodwyn Street property is located in a nice residential area of large lots, with an amount of land per lot greater than the usual subdivision lot. In fact the 360 Goodwyn Street property has a lot of 2.7 acres, which backs up to the Memphis Country Club golf course. This general residential area has maintained its popularity because of its proximate location to the Memphis Country Club, and because the area is well landscaped. When petitioner inherited the 360 Goodwyn Street property in 1977, the overall condition of the home was fair to poor, and the house reflected deferred maintenance. The exterior and interior of the house needed painting, and the yard needed a lot of work. The May 30, 1978, appraisal *633 report, prepared in connection with the estate tax return, stated that the guest house, a small detached frame house, was in very bad condition. The report further indicated that the roof leaked, the ceiling had fallen, and parts of the floor had rotted. The report concluded the guest house added no value to the property. At that time, the 360 Goodwyn Street property was appraised at a fair market value of $ 150,000, with $ 75,000 allocated to the land and $ 75,000 to the house. Normally the value of the land would constitute only 20 to 25 percent of the total value, but the unusual allocation in this instance resulted from the large size and desirable location of the lot and the generally poor condition of the house. Approximately four and one-half years later, the 360 Goodwyn Street property was appraised at a fair market value of $ 375,000. On October 10, 1986, it was appraised at $ 475,000. In 1983, the appraiser found the guest house did not exhibit any evidence of its previous poor condition. Instead, in the 1983 appraisal report, the appraiser stated that someone has now made a "cute little guest house" out of the detached frame house. Further, the appraiser noted *634 that substantial maintenance or restoration occurred not only to the guest house, but also to the entire property over the years between the 1978 and 1983 property appraisals. From her mother's death in 1977 through 1985, petitioner claimed on her tax returns deductions totaling $ 133,143.88 for expenditures in connection with the 360 Goodwyn Street property as follows: 1977 Not shown by record
1978 $     -0-      1979 9,870.30   1980 11,946.28   1981 14,199.39   1982 25,977.49    1983 17,677.42   1984 26,316.00   1985 27,157.00   Total:
$ 133,143.88 [3]
During this same period, petitioner reported substantial amounts of adjusted gross income on her tax returns, mostly dividends, rents and royalties, and interest income, with some small amounts of W-2 wage income from a family business, as follows: 1977
Not shown by record
1978
$  56,260.00
1979
72,706.88
1980
82,527,30
1981
107,269.27
1982
101,209.67
1983
282,694.82
1984
154,558.00
1985
127,197.00
*635 For the two years involved in this case petitioner claimed expenses in connection with the 360 Goodwyn Street property as follows: 1982
Telephone
$    241.05
Utilities
2,843.58
Yard and lawn maintenance
5,590.04
Heating and air-cond. repairs
758.40
Painting
3,741.00
General repairs and maintenance
3,026.82
Rug cleaning
1,882.48
Insurance
854.00
Labor (yard maintenance, house
cleaning, etc.)
5,627.42
Security (burglar) service charge
891.39
Depreciation (lawn cart)
407.11
Financial publications
114.20
Total
$ 25,977.49
Telephone
$    240.61
Utilities
2,828.58
Household supplies
370.37
Painting
380.00
Plumbing repair
925.09
Lawn and yard maintenance
1,873.73
General repairs and maintenance
1,631.76
Security service
907.45
Insurance
901.00
Labor (yard maintenance, house
cleaning, etc.)
6,845.68
Depreciation (lawn cart and
lawn edger)
647.15
Financial publications
126.00
Total
$ 17,677.42
Petitioner has generally established that she in fact expended these amounts. These expenditures were not solely for the 360 Goodwyn Street property and these expenditures were not *636 always what they purported to be. The $ 241.05 claimed for telephone in 1982 is overstated by $ 17.64, which was a payment to South Central Bell in late 1981. For both 1982 and 1983, the telephone expenses included some long distance calls. The record does not establish that these long distance calls were business rather than personal calls. The utilities expenses for 1982 were substantiated to the extent of $ 2,680.35 and for 1983 to the full extent of the $ 2,828.58 claimed. This represented payments to the Memphis Light, Gas and Water Division for electricity, gas, water, sewer charges, payments on an insulation loan, outdoor lighting, and a city service fee. These bills were still in the name of Robert H. Peoples, petitioner's father, who had died in 1966. Of the $ 5,590.04 claimed for yard and lawn maintenance in 1982, some of the checks making up this amount were payable to one of petitioner's sons and indicated they also included items such as Cadillac tags, alternator, light bulbs, and groceries. While some of the checks refer to "Goodwyn," many simply refer to "Roses," "Grass, Sod, Trees," "Yard Spraying," "Rose Care" or simply "Yard & Lawn Maintenance" or contain *637 no explanation. The record does not establish that these large expenditures in 1982 were solely for the 360 Goodwyn Street property or that they were reasonable in amount. Of the $ 1,873.73 claimed for "Lawn and Yard maintenance" in 1983, many of the checks do not indicate the nature of the expenditures. Some of the checks indicate a purpose such as "stump removal," "leaves hauled," or "Lawn Supplies" but do not refer to the Goodwyn property. Only one check specifically refers to the Goodwyn property. The record does not establish that these expenditures in 1983 were solely for the Goodwyn Street property or that they were reasonable in amount. Petitioner claims the expenses in connection with the Cadillac as security expenses. Apparently at an earlier time after her mother's death, a policeman had suggested to petitioner that having the car parked in the garage made the property appear to be lived in and made the property more secure. She continued to claim expenses connected with the Cadillac long after a burglar alarm system had been installed. Petitioner also claimed the phone was necessary because it was tied in with the burglar alarm security system. Petitioner deducted *638 $ 891.39 for the burglar alarm system in 1982 and $ 907.45 in 1983, but some of these expenditures were for the burglar alarm at petitioner's Lombardy Road residence. The so-called "lawn cart" on which depreciation was claimed both years was a golf cart which petitioner used to get around on the property because she had bad knees. Petitioner purchased the golf cart for $ 2,714.05 on November 2, 1982. In 1985 she purchased another golf cart for $ 6,618 and began claiming depreciation on it. The record does not establish that these golf carts served a business purpose rather than a personal purpose. For 1982, petitioner claimed $ 3,741 for painting costs. Neither of the checks, one dated in January for $ 2,204 and one dated in September for $ 1,537, makes any reference to the Goodwyn Street property. The record does not establish that these painting expenses were for that property or were reasonable in amount. [4]
Also in *639 1982 petitioner claimed $ 3,026.82 for "General repairs and maintenance." Only $ 2,882.13 of this amount represented 1982 expenditures, since an amount of $ 144.69 was a check written in 1981. Some of these 1982 expenditures were for paper towels, cups, drapes, and pillows. Some checks written to Malone & Hyde's Cash & Carry, a Memphis grocery store, in the amounts of $ 144.96 and $ 226.26, are labeled "supplies" or "cleaning supplies." Other checks are written to one of petitioner's sons, with the reference to Goodwyn written in a different handwriting. Other checks bear no explanation as to their purpose. While some of these 1982 expenditures may have been for repairs or maintenance at 360 Goodwyn Street, only the item of chimney repair in the amount of $ 400 is adequately substantiated. Again in 1983 petitioner claimed $ 1,631.76 for "General repairs and maintenance." According to the notations on the checks, these expenditures included, among other things, drapery repairs, lawn mower repairs, rug cleaning, upholstery repairs, vacuum cleaner repairs, appliance repairs, and dishwasher repairs. The record does not establish that these expenditures related to the 360 Goodwyn Street *640 property. In 1982 petitioner claimed $ 1,882.48 for rug cleaning. The eight checks in support of this item were written to two rug companies throughout the year from January through November of 1982, and none of the checks refers to the 360 Goodwyn Street property. The record does not establish that these checks were in payment for rug cleaning at that property or that the amounts were reasonable. [5]
Beginning during her college days, petitioner regularly read the Sunday edition of The New York Times newspaper. In the period from 1979 through 1985, she deducted this expense as a "financial publication." The record does not establish that this expenditure was anything other than a personal expenditure. The largest deductions claimed each year were labor expenses allegedly in connection with yard maintenance and house cleaning at the 360 Goodwyn Street property. The amounts claimed were $ 5,627.42 in 1982 and $ 6,845.68 in 1983. [6] In *641 support of these expenditures petitioner submitted checks written to various individuals, approximately 65 percent of the totals of which were allocated to the 360 Goodwyn Street property. These persons apparently performed yard work and house cleaning at both the Goodwyn property and at petitioner's own residence. The allocation was apparently based on the respective acreage of each location. There is no evidence to establish the actual hours of work, any payments properly allocable to the 360 Goodwyn Street property, or the reasonableness of any such payments. Some of the checks indicate that the expenditures were nondeductible personal items unrelated to any business or investment purpose. For example there are checks labeled "vacation," "loan for car tires," "loan to buy car," "Happy Birthday," "Merry Christmas," and "for party parking." From 1977 up to the time of the trial, petitioner *642 has retained the 360 Goodwyn Street property furnished as it was furnished at the time of her mother's death. Petitioner has never spent a night in that house. However, before her mother's death, an individual was living in the house rent-free. That individual continued to live there rent-free until he moved out in December of 1980. One of petitioner's sons and his family have stayed in the house on two different occasions while visiting petitioner. From the time of her mother's death in 1977 up to the time of the trial, petitioner's plans for any possible development or other disposition of the 360 Goodwyn Street property have remained vague, indefinite, unspecific, and essentially unformed. She vaguely thinks of herself as holding the property "for investment purposes." Other than the checks written on her personal bank accounts, many of which have been discussed above, petitioner has maintained no business books or records in regard to the 360 Goodwyn Street property. Petitioner has had no particular plan of improvements or maintenance, has never set any ceiling on the amount or types of expenditures she is willing to incur in connection with this property, and has been guided *643 solely by her desire to restore the house and grounds to their former elegance in this "very proud neighborhood" and to maintain the house and grounds in what she regards as "tip-top condition." Many improvements have been made over the years, including restoration of the guest house and the grounds. The property has appreciated from $ 150,000 in 1977 to $ 475,000 in 1986. Other properties in that residential area have similarly appreciated over that period of time. Of the 1986 appraised value of $ 475,000, more than 50 percent, or $ 265,000, was allocated to the land while only $ 210,000 was allocated to the house at 360 Goodwyn Street. Petitioner spends much of her free time at the 360 Goodwyn Street property, visiting the house almost every day. Most of the landscaping, lawn care, and gardening expenses over the years would have been unnecessary if the property were to be subdivided. Petitioner has no plans to subdivide the property. Petitioner also has no plans to sell the property at any time in the foreseeable future. [7] Petitioner has never sold any of the furniture or furnishings in the house. The house, furniture, furnishings, and the 1965 Cadillac automobile are *644 maintained essentially as they were when petitioner's parents lived at 360 Goodwyn Street. OPINION Petitioner inherited from her mother a residence that petitioner has never lived in and has never offered for rent or for sale. In the period from 1979 through 1985, petitioner has deducted on her tax returns over $ 133,000 as expenses in connection with this residential property. Petitioner claims that she is holding this residential property for investment purposes and that thus the expenses are deductible under section 212. She has also amended her petition to claim depreciation on this residential property. In the case of an individual taxpayer, section 212 allows a deduction for ordinary and necessary expenses paid (1) for the production or collection of income or (2) for the management, conservation, or maintenance of property held for the production of income. [8]Section 167(a) similarly allows a depreciation *645 deduction for "property held for the production of income." [9] To be deductible under section 212, the expenses must be "ordinary and necessary," i.e., they must be reasonable in amount and must bear a reasonable and proximate relation to the production or collection of taxable income or to the management, conservation, or maintenance of property held for the production of income. [Sec. 1.212-1(d), Income Tax Regs.] The term "income" is not limited to current income. As defined in the pertinent regulations: The term "income" for the purpose of section 212 includes not merely income of the taxable year but also income which the taxpayer has realized in a prior taxable year or may realize in subsequent taxable years; and is not confined to recurring income but applies as well to gains from the disposition of property. * * * [Sec. 1.212-1(b), Income Tax Regs.] *646 Whether property is held for the production of income or for personal purposes depends upon the taxpayer's profit objective or lack thereof as determined by all of the facts and circumstances of the particular case. Section 183 provides in part that if the individual taxpayer's activity is "not engaged in for profit," then only those deductions allowable regardless of a profit objective, such as interest or taxes, [10] are permitted. Sec. 183(b). The term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable under section 162 or under section 212. Sec. 183(c). The standard for determining whether the individual taxpayer is engaged in an activity for the production or collection of income (sec. *647 212(1)) or for the management, conservation, or maintenance of property held for the production of income (sec. 212(2)), as well as for determining whether the taxpayer is carrying on a trade or business (sec. 162), is whether the taxpayer engaged in the activity with an actual and honest objective of making a profit. Elliott v. Commissioner, 90 T.C. 960 (1988); Dreicer v. Commissioner, 78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). [11] While a reasonable expectation of profit is not required, the taxpayer's objective of making a profit must be bona fide. Elliott v. Commissioner, 84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 578 (2d Cir. 1980). In making this factual determination, we give greater weight to objective factors than to a taxpayer's mere statement of his or her intent. Sec. 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Section 1.183-2(b), Income Tax Regs., lists some nine relevant factors to be considered in determining whether an activity *648 is engaged in for profit. [12] No one factor is conclusive, and we do not reach our decision by merely counting the factors that support each party's position. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). *649 Here we begin our analysis of the evidentiary record by first looking at petitioner's acquisition of the property. The acquisition of property by inheritance is a neutral fact. McBride v. Commissioner, 50 T.C. 1, 7 (1968). The fact that the property had been the personal residence of petitioner's mother is a neutral fact; we must instead consider for what purpose petitioner herself holds the property. Petitioner has never occupied the property as her residence. Thus, while dealing with residential property, this case does not involve the usual fact situation where a taxpayer has moved out of his residence and then tries to deduct expenses connected with that residence. In those cases the question is whether or not, after abandonment of the residence (abandonment of the personal use), the taxpayer has converted that property to an income-producing purpose, either as rental property or as investment property held for post-conversion appreciation in value. Grant v. Commissioner, 84 T.C. 809, 824-826 (1985), affd. without published opinion 800 F.2d 260 (4th Cir. 1986); Meredith v. Commissioner, 65 T.C. 34 (1975); *650 Newcombe v. Commissioner, 54 T.C. 1298 (1970); May v. Commissioner, 35 T.C. 865 (1961), affd. 299 F.2d 725 (4th Cir. 1962) (same result with yacht); Horrmann v. Commissioner, 17 T.C. 903 (1951); Robinson v. Commissioner, 2 T.C. 305 (1943). As these cases show, there must be some affirmative act appropriating the property to an income-producing purpose. Petitioner has never offered the 360 Goodwyn Street property for rent. To the contrary, as will be further discussed below, petitioner permitted an individual to live in the house rent-free for three years after she inherited it. Petitioner does not claim that she holds the property to produce rental income; she claims instead that she holds the property for investment purposes, i.e., for post-acquisition (post-death of mother) appreciation in value. Indeed the record shows that the property has appreciated in value from $ 150,000 in 1977 to $ 375,000 in 1983 to $ 475,000 in 1986. However, other properties in that same neighborhood, not surprisingly, have had a similar appreciation in value over that period of time. As we stated in Jasionowski v. Commissioner, 66 T.C. 312, 323 (1976): *651 [I]f the anticipation of eventually selling the house at a profit were in itself sufficient to establish that the property was held with a profit-making intent, rare indeed would be the homeowner who purchased a home several years ago who could not make the same claim. Given this almost universal experience with appreciating residential property, we think something more is required than a taxpayer's mere statement that she holds residential property for investment purposes and the mere fact of appreciation over a period of nine years. While we cannot, and will not attempt to, fashion a bright-line test as to what that "something more" must be, here the totality of the facts and circumstances convinces us that petitioner did not possess the requisite profit objective. We think that where a taxpayer claims to hold residential property for investment purposes, at a minimum there must be some affirmative act on the part of the taxpayer to show that the property has in fact been appropriated *652 to an income-producing purpose. Normally, but not invariably, a taxpayer would try to rent out the property to attempt to reduce the cost of holding the property for appreciation. Here petitioner made a conscious decision not to rent the house because of her professed concern that tenant-occupancy might cause the property to deteriorate. However, having rejected the normal method of reducing the expense of holding residential property for investment purposes, petitioner had no other plan or strategy to control expenses. There is no affirmative act in this case to show that the property was held for investment as opposed to personal purposes. While petitioner vaguely regards herself as holding the 360 Goodwyn Street property for investment purposes, her actions in the real world indicate she has treated the property as essentially a second home. For three years after her mother's death, until December of 1980, the house continued to be occupied by an individual who had lived in the house before her mother's death. This individual lived in the house rent-free both before and after the mother's death. Petitioner characterizes this continued rent-free occupancy as "a security thing, *653 " but there is no indication that this person's "security services" in any way approximated the fair rental value of the property. [13] Petitioner did not explain why or how this individual's rent-free occupancy differed from occupancy by a rent-paying tenant, which she rejected. Also, while petitioner never spent a night in the house, her son and his family stayed in the house on at least two different occasions while visiting petitioner. Moreover, the nature of the expenses claimed by petitioner shows she was treating this house like a second residence. Petitioner deducted expenses for light bulbs, drapes, pillows, paper towels, and cups. In 1983, six years after her mother's death, petitioner deducted expenses for drapery repairs, rug cleaning, upholstery repairs, vacuum cleaner repairs, appliance repairs, and dishwasher repairs. Petitioner did not carry on her activity in regard to 360 Goodwyn Street in a businesslike *654 way. Other than checks written on her personal bank accounts, she maintained no business books or records. Petitioner has never had any particular plan of improvements or maintenance. She has never set any ceiling on the amount or types of expenditure she is willing to incur in connection with this property. Over the years she has deducted large amounts that cannot be deemed to be proximately or reasonably related to holding the property for appreciation in value. From 1980 to 1985 she deducted a total of $ 13,258 for painting. In the period from 1979 to 1989, she deducted a total of $ 46,873.71 just for alleged labor expenses in connection with yard maintenance and house cleaning. These large recurrent expenditures seem to relate more to maintaining an elegant second home than to maintaining property held for appreciation in value. [14] Petitioner failed to take any steps to contain or control the expenses in connection with the 360 Goodwyn Street property. She was solely guided by her desire to restore and maintain this property in what she regards as "tip-top condition" and up to the standards of what she characterized as this "very proud neighborhood." Needless to say, petitioner's *655 substantial income from other sources enabled her to do so. Also the fact that she visited the house almost every day suggests she derived considerable personal satisfaction and pleasure from her efforts in connection with her parents' former home. More importantly, right up to the time of trial petitioner still had no plans for the ultimate development or other disposition of this residential property. She had no plans to subdivide the property. She had no plans to sell the property at any time in the foreseeable future. The best that can be said for petitioner is that she would probably be willing to sell if the "right offer" came along. That, however, can be said of most homeowners *656 even in the case of their primary residence, let alone in the case of a second residence, as here. Based on all of these factors, we cannot find that petitioner held this residential property with an actual and honest objective of making a profit. Accordingly, we conclude that this was an "activity not engaged in for profit" and petitioner is not entitled to deduct the expenses or depreciation deductions claimed. Decision will be entered for the respondent, except as to the addition to tax. Footnotes
1. Respondent also determined an addition to tax under section 6651(a)(1) for the year 1982 in the amount of $ 9.85, but now concedes that petitioner timely filed her 1982 tax return within the time as extended.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in question, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Included in the itemized statement of expenses for each year was an item labeled "Financial publications." As will be discussed in the text below, this expenditure was for the Sunday edition of The New York Times newspaper.↩
4. In the six-year period from 1980 to 1985, petitioner had deducted a total of $ 13,258 for painting as follows: ↩
Year
Amount
1980
$  1,475
1981
1,802
1982
3,741
1983
380
1984
2,500
1985
3,360
Total:   $ 13,258
5. Included among the personal property petitioner inherited from her mother were 13 rugs at the 360 Goodwyn Street property. These rugs were appraised in 1977 at values from $ 7.50 to $ 1,000, for a total appraised value of $ 3,437.50.↩
6. Over the period from 1979 through 1985, petitioner had deducted a total of $ 46,873.71 for this item as follows: ↩
Year
Amount
1979
$  4,383.64
1980
4,324.36
1981
4,565.61
1982
5,627.42
1983
6,845.68
1984
10,317.00
1985
10,810.00
Total:   $ 46,873.71
7. Petitioner became extremely evasive and less than forthright when she was questioned as to what disposition she had made in her will for the 360 Goodwyn Street property.↩
8. Section 212 provides that: In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year -- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax. ↩
9. The result in this case would be the same whether the applicable version of section 167↩ is that in effect in 1977 when petitioner inherited the property or that in effect for property placed into service after December 31, 1980, in taxable years ending after such date.
10. Here there apparently was no mortgage and hence no mortgage interest to be deducted. Petitioner deducted the real estate taxes on the 360 Goodwyn Street property on Schedule A of her returns, and those deductions have been allowed.↩
11. See also Jenkins v. Commissioner, T.C. Memo. 1988-292, affd. without published opinion 880 F.2d 414 (6th Cir. 1989); Houle v. Commissioner, T.C. Memo. 1985-389↩. 12. These factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.↩
13. We note that petitioner also characterized the retention of the Cadillac automobile as being for security purposes. The deduction of expenses of tags and auto parts for the Cadillac continued long after a burglar alarm system had been installed in the house.↩
14. In some instances, petitioner deducted expenses connected with her residence on Lombardy Road. As to the many large deductions, these amounts either included expenses connected with her Lombardy Road residence or were otherwise unreasonable in amount. While it is not necessary to reach the issue, we would conclude that petitioner has failed to establish that these were "ordinary and necessary" expenses under section 212 and section 1.212-1(d), Income Tax Regs.↩